UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

AMERICAN PATRIOT EXPRESS, *et al.,*

                          Plaintiffs,

     -against-                                        1:20-CV-672 (LEK/CFH)

CITY OF GLENS FALLS, *et al.,*

                          Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiffs American Patriot Express ("APEX"), David Vanscoy, Florence Sherman, and E.S. (collectively, "Plaintiffs") bring this action for injunctive and declaratory relief against defendants the City of Glens Falls (the "City" or "Glens Falls"), and, all in their official capacities, Glens Falls Mayor Daniel Hall, Glens Falls Police Chief Anthony Lydon, and Glens Falls City Clerk Robert Curtis (collectively, "Defendants"). Dkt. No. 1 ("Complaint"). Plaintiffs challenge the constitutionality of Glens Falls City Code § 87 under the First, Second, and Fourteenth Amendments to the United States Constitution. Id. ¶¶ 11–12. Plaintiffs seek to enjoin the enforcement of § 87 and seek a declaration that it is unconstitutional. Id. ¶ 11. Before the Court is Plaintiffs' motion for a preliminary injunction, as well as an accompanying Memorandum of Law. Dkt. Nos. 4 ("Motion"); 4-2 ("Plaintiffs' Memorandum of Law"). In response to Plaintiffs' Motion, Defendants filed a response in opposition. Dkt. No. 24-11 ("Response"). Attached to the Response are declarations from Curtis and Lydon. Dkt. Nos. 24-1 ("Curtis Declaration"); 24-2 ("Lydon Declaration"). Plaintiffs subsequently filed a reply. Dkt. No. 30 ("Reply").

For the reasons stated below, Plaintiffs' Motion is granted in part and denied in part.

II.    **BACKGROUND**

    **A.  Glens Falls City Code § 87**

Glens Falls City Code § 87 was passed in January 2020. Pls.' Mem. of Law at 32. Section

87 regulates "demonstrations," defined as "pre-planned gathering[s] of 25 or more persons . . .

convene[d] for the purpose of a public exhibition including a procession, parade, protest, picket,

march or rally," § 87-2(A), on "public" property, defined as "any place to which the public has

unrestricted access," excluding indoor spaces, § 87-2(C).

Any "person, corporation, partnership or other entity" that "hold[s] or cause[s] to be held"

any "demonstration," as defined above, anywhere on "public" property, as defined, must first

acquire a permit. See § 87-2(B). Section 87-4(A) provides that permit applications must be

submitted to the City Clerk and "will be processed in order of receipt[,] and in all cases decisions

whether to grant or deny the application will be delivered within 14 days of application, unless,

upon written notice to the applicant, a further 14-day extension is necessary." § 87-4(A).

Section 87-4(B) provides an exclusive list of nine reasons that the City Clerk may deny a

permit. § 87-4(B). Among other reasons, the City Clerk may deny a permit if "[t]he applicant is

legally incompetent to contract or to sue and be sued." § 87-4(B)(3).[1]

---

[1]  The City Clerk may deny a permit on any of the other following bases: the applicant
"has on prior occasions made material misrepresentations regarding the nature or scope of an
event or activity previously permitted or has violated the terms of prior permits issued to or on
behalf of the applicant," § 87-4(B); "[t]he application for permit (including any required
attachments and submissions) is not fully completed and executed," § 87-4(B)(1); "the
application for permit contains a material falsehood or misrepresentation," § 87-4(B)(2); "[t]he
applicant or the person on whose behalf the application for permit was made has on prior
occasions damaged City property and has not paid in full for such damage or has other
outstanding and unpaid debts to the City," § 87-4(B)(4); "[a] fully executed prior application for

Section 87-3(A)(13) prohibits the use of "signs" "as defined in City Code, Chapter 180."

§ 87-3(A)(13). Based on the text of Chapter 180 of the City Code, it is not clear what is

encompassed by the term "sign" in § 87-3(A)(13), as "sign" is not defined anywhere in Chapter

180. See generally City Code Chapter 180. But it appears that "sign" encompasses a capacious

category of instruments used to display text or images for a variety of purposes. In Chapter 180,

"signage" is defined as "[a]ny signs as defined in this chapter . . . ,"[2] Chapter 180-3, and is said to

include "any material, structure, device, or design that is composed of any form of visual

presentation in or on which letters and symbols as pictorial matter is placed when used or located

out of doors or upon the exterior of any building, including a window display," id. Chapter 180-

---

permit for the same time and place has been received, and a permit has been or will be granted to
a prior applicant authorizing uses or activities which do not reasonably permit multiple
occupancy of the particular location or part thereof," § 87-4(B)(5); "[t]he use or activity intended
by the applicant would conflict with previously planned programs organized and conducted by
the City and previously scheduled for the same time and place," § 87-4(B)(6); "[t]he use or
activity intended by the applicant would present an unreasonable danger to the health or safety of
the applicant, of employees of the City or of the public," § 87-4(B)(7); or "[t]he use or activity
intended by the applicant is prohibited by law or by the City Code and ordinances of the City," §
87-4(B)(8). Should the City Clerk deny the application, the City Clerk must "clearly state, in
writing, what the grounds for denial are, and, if possible to cure the defect, the City will clearly
state in writing how that cure could be procured." § 87-4(C). Should the City deny the
application on the basis of a conflict with the time and place of a City program, as provided at §
87-4(B)(6), "the City will make an alternate location recommendation." § 87-4(D). The statute
also provides processes for resubmitting rejected applications and appealing denials. "Should the
applicant resubmit an altered application the City will make a decision on the reformed
application within 7 days." § 87-4(C). "An unsuccessful applicant may appeal the denial to the
Mayor, in writing, within 7 days of receipt of the denial. The Mayor will have 7 days from receipt
of the written appeal to make a decision. If the Mayor affirms the permit denial, the applicant
may seek judicial review in state court." § 87-4(E).

   [2] Terms for various categories of signs are defined. See, e.g., Chapter 180-3 (defining
banners as "[a]ny sign constructed of fabric or similar flexible material that is mounted or
attached to a pole, building, fence, or any other structure, which displays advertising or
promotion for an event or a product. National, state, municipal, or the official flag of any
institution or business, shall not be considered banners.").

4(G)(1) provides certain restrictions that apply to "temporary signs," a term defined to include "political aid election notices," in addition to commercial advertisements "and other signs of similar nature." Chapter 180-4(G)(1). Chapter 180-4(G)(1) prohibits the display of "political aid election notices" and other "temporary signs" prior to sixty days before "the event." Id. Chapter 180-4(G)(3) provides that "political signs or election notices," specifically and uniquely, shall be limited to a maximum size of six square feet. Chapter 180-4(G)(3).

Those who violate any provision of § 87 are subject to fines and other unspecified penalties. Specifically, "[a]ny person or other legal entity who violates any of the provisions of this local law shall be guilty of an offense and shall be subject to the following penalties: I. A fine not to exceed $250.00 [and] II. Such other penalties afforded by law." § 87-7.

Section 87 contains other provisions that Plaintiffs do not specifically challenge. For example, § 87-3 prohibits a long list of items at demonstrations, including alcoholic beverages, § 87-3(A)(1), "[e]xplosives, fireworks, or pyrotechnics," § 87-3(A)(2), and masks, § 87-3(A)(3), as well as certain activities, such as blocking entrances to buildings, § 87-3(A)(12), and blocking "highway, road, or rail traffic," § 87-3(A)(15). Section 87-6 imposes certain cleanup responsibilities on permit holders. § 87-6.

### B. Plaintiffs' Complaint and Motion

Plaintiffs are a political organization with a conservative mission, and a collection of people who frequently engage in protests in Glens Falls in support of police, President Donald Trump, and United States Congresswoman Elise Stefanik, as well as counter-protests against left-wing demonstrators, and who plan to continue doing so. Compl. ¶¶ 16–23, 28-49.

APEX is an organization founded and run by Sherman and Vanscoy whose mission is to

4

organize demonstrations in support of conservative causes and in opposition to left-wing causes. Id. ¶¶ 16, 28–30. E.S., a minor, along with Sherman and Vanscoy, would like to participate in upcoming APEX-organized protests. Id. ¶¶ 17–23, 78. Prior to the law's passage, Vanscoy and Sherman both participated in political demonstrations organized by APEX and attended by more than twenty-five people in outdoor public spaces in Glens Falls. Id. ¶¶ 17, 20, 32. The demonstrations that Plaintiffs, via APEX, typically organized often took the form of counter-protests in opposition to left-wing demonstrations, which were organized on one or two days' notice. Id. ¶ 42. Plaintiffs also organized rallies, via APEX, in support of political candidates and causes, that did not take the form of counter-protests. Id. ¶¶ 32–35. Vanscoy, Sherman, and E.S. have all abstained from protesting since the passage of § 87, because they fear that the City "will enforce City Code § 87 in a discriminatory manner." Id. ¶¶ 18, 21, 23. E.S. has abstained for the additional reason that E.S., as a minor, is allegedly prohibited from demonstrating under § 87. Id. ¶ 23.

Plaintiffs have, on at least one instance, refrained from protesting because the delay inherent in the maximum 28-day review period precluded their protest. Specifically, on June 3, when Sherman learned that a planned Black Lives Matter ("BLM") protest was to occur on June 5, Plaintiffs wished to organize a simultaneous counter-protest for but refrained from doing so, because they believed that § 87 required a permit for this counter-protest and that § 87's 28-day permit processing period precluded their acquisition of a permit on two days' notice. Id. ¶¶ 66–70. With the intention of protesting, Sherman created signs for use at the protest. Id. ¶ 70.

At the time that they filed the Complaint and Motion, Plaintiffs planned to stage a protest countering the message of the June 5 BLM protest, as soon as possible. Id. ¶¶ 78–83. At that

demonstration, protesters were to advocate in favor of police and display political signs in support of Trump and Stefanik. Id. ¶¶ 79–80. Plaintiffs anticipated that the demonstration would be attended by more than twenty-five people. Id. ¶ 81. The rally was "time sensitive," because "plaintiffs want[ed] to send an important message to police at a time when they and their reputation is under attack." Id. ¶ 82.

Plaintiffs assert claims under the First, Second,[3] and Fourteenth Amendments. With respect to their First Amendment claims, Plaintiffs allege: (1) that § 87 is overbroad, as it imposes an excessively long delay in the permitting process that applies to a broad category of public gatherings and to all outdoor public space in Glens Falls, id. ¶ 7; Pls.' Mem. of Law at 1, 17–23; (2) that it impermissibly censors speech based upon the speech's content, by singling out political signs for certain restrictions, Compl. ¶ 7; Pls.' Mem. of Law at 1, 12–14; (3) that it unconstitutionally grants Defendants limitless discretion through the permitting process via Defendants' authority to delay decisions on applications, Compl. ¶ 7; Pls.' Mem. of Law at 2, 14–17; (4) that it unconstitutionally imposes criminal liability for protected First Amendment activity without a scienter requirement, Pls.' Mem. of Law at 24–26; and (5) that it abridges the rights of minors to organize demonstrations, Compl. ¶¶ 23, 92.

### C. Defendants' Response

Defendants argue both that Plaintiffs lack standing on a variety of grounds and that Plaintiffs' First Amendment claims fail on the merits. Defendants argue that Plaintiffs lack

---

[3] While Plaintiffs assert a claim under the Second Amendment, id. ¶ 12, nowhere in the Complaint or Motion do they identify any specific provision of § 87 that violates the Second Amendment nor detail any basis for a Second Amendment claim. Accordingly, this Memorandum-Decision and Order addresses only Plaintiffs' claims under the First Amendment, as applied to Defendants via the Fourteenth Amendment.

standing because: (1) properly construed, § 87 does not require a permit for the type of protests in

which Plaintiffs have engaged and state that they plan to engage in the future; (2) properly

construed, § 87 does not ban signs at demonstrations; (3) Plaintiffs have not yet applied for a

permit, and thus cannot challenge the constitutionality of the permitting process; and (4)

specifically with respect to E.S.'s challenge to 87-4(B)(3), Sherman is not an adequate

representative for E.S. and otherwise lacks third-party standing to sue on E.S.'s behalf.  Response

at 11–16.

      With respect to the merits, Defendants argue, primarily, that § 87 is similar to an

ordinance held to be constitutional under the First Amendment in Thomas v. Chicago Park

District, 534 U.S. 316 (2002) and thus is itself constitutional in its entirety. Response at 5–11.

Defendants also argue that the small geographic size of Glens Falls and the small size of its

police force create unique difficulties in policing demonstrations that justify the limitations on

freedom of speech imposed by § 87 as a constitutional matter. Id. at 10–11.

### D. Thomas v. Chicago Park District

      In their Response, Defendants rely heavily on an analogy between § 87 and the municipal

park ordinance at issue in Thomas. See Response at 5–11. And understandably so, as § 87 is

modeled in large part after the law challenged, and upheld, in that case. See Response at 5 (citing

Lydon Decl. ¶ 16; Curtis Decl. ¶ 13). In Thomas, the plaintiffs challenged certain provisions of a

Chicago permitting ordinance under the First Amendment. The Chicago ordinance required

permits for demonstrations of more than fifty people, Thomas, 534 U.S. at 318, while § 87

provides a twenty-five person minimum, § 87-2(A). The ordinance in Thomas, like § 87,

provided that permit applications must be processed in twenty-eight days, with notice but not an

explanation required for an extension beyond fourteen days. Thomas, 534 U.S. at 318; § 87-4(A)

(C). Moreover, the substantive criteria governing the decision to grant or deny permits are largely

similar in both statutes. See Response at 6. The Chicago ordinance, however, applied only to

Chicago's park system, see Thomas, 534 U.S. at 318, while § 87 applies to all outdoor public

property within city limits, § 87-2(A). The Supreme Court in Thomas held that the content-

neutral permitting regulations challenged in that case did not constitute an invalid prior restraint

and, thus, did not violate the First Amendment. Thomas, 534 U.S. at 324–25.

But Thomas is potentially distinguishable from this case in a few respects, which the

Court briefly summarizes here. First, as described, the ordinance in Thomas differed in certain

ways from § 87.

Second, the Chicago ordinance provisions analogous to the § 87 provisions challenged in

this case were not at issue in Thomas. The plaintiffs in that case claimed that the Chicago

ordinance granted city officials unbridled discretion in the decision to grant or deny permits, a

defect the plaintiffs attributed in part to the indefinite nature of the substantive criteria governing

this decision, and in part to features of the judicial review provision. Id. at 322–23. In this case,

by contrast, Plaintiffs challenge the provision setting a time limit for the initial review of a permit

application, a provision prohibiting the use of signs at protests, a provision barring individuals

incompetent to sue or be sued from obtaining a permit, and the sanctions provision. See Compl.

¶¶ 7, 23, 92; Pls.' Mem. of Law at 1–2, 24–26. While portions of the Complaint appear to

challenge the entirety of § 87, see, e.g., Complaint ¶ 88 ("Glens Falls Code § 87 violates

plaintiffs' First Amendment rights of free speech and free association."), neither the Complaint

nor Plaintiffs' briefing raises any specific challenges to the substantive criteria by which permit

decisions are to be made or to the judicial review provision. See generally Compl.; Pls.' Mem. of Law.

Third, as discussed more fully below, Thomas differs in that the plaintiffs in that case did not raise the same First Amendment arguments as Plaintiffs do here. The Thomas plaintiffs argued only that the statute vested unbridled discretion in city officials. Thomas, 534 U.S. at 323. The plaintiffs "[did] not argue that the Park District's ordinance fails to satisfy other requirements of . . . time, place, and manner jurisprudence, under which the permit scheme must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." Id. at 323 n.3. Plaintiffs in this case, by contrast, appear to raise all of these challenges.

## III.   LEGAL STANDARD

To obtain a preliminary injunction, "a plaintiff must demonstrate (1) irreparable injury and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions on the merits and a balance of hardships tipping decidedly in the plaintiff's favor in order for a preliminary injunction to issue." Fair Hous. in Huntington Comm. v. Town of Huntington, 316 F.3d 357, 365 (2d Cir. 2003) (internal quotation marks omitted). "When a plaintiff seeks an injunction staying governmental action 'taken in the public interest pursuant to a statutory or regulatory scheme,' however, an injunction will issue only if the plaintiff can show irreparable injury and meet 'the more rigorous likelihood-of-success standard.'" Id. (quoting Bery v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996)) (internal quotation marks and citation omitted). When the movant seeks not merely a prohibitory "stay," but a "mandatory" order—that is, if the injunction would "alter the status quo by commanding some positive act"—the standard is even

higher; the movant must demonstrate a "'clear' or 'substantial' likelihood of success on the merits." Mastrovincenzo v. City of New York, 435 F. 3d 78, 89 (2d Cir. 2006) (quoting No Spray Coalition, Inc. v. City of New York, 252 F.3d 148, 150 (2d Cir. 2001)).

## IV.   DISCUSSION

### A. Standing

Constitutional standing requires: (1) that an injury be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that there be "a causal connection between the injury and the conduct complained of"; and (3) that it be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

Traditional Article III standing requirements "are relaxed when the matter involves a prior restraint of speech or expression because of the potential for abuse of First Amendment rights." Lusk v. Village of Cold Spring, 418 F. Supp. 2d 314, 320 (S.D.N.Y. 2005) (quoting Knoeffler v. Town of Mamakating, 87 F. Supp. 2d 322, 332 (S.D.N.Y. 2000)), rev'd on other grounds, 475 F.3d. 480 (2d Cir. 2007). "Where, as here, a plaintiff claims that a statute on its face impinges on the right of free speech, the Supreme Court has allowed plaintiffs to sue as long as the plaintiff demonstrates 'a substantial risk that application of the provision will lead to the suppression of speech.'" Id. (quoting Lerman v. Board of Elections, 232 F. 3d 135, 144 (2d Cir. 2000)). "Pre-enforcement First Amendment claims, moreover, are analyzed 'under somewhat relaxed standing . . . rules,' because the law recognizes that plaintiffs asserting pre-enforcement challenges 'face an unattractive set of options if they are barred from bringing a facial challenge: refraining from activity they believe the First Amendment protects, or risk[ing] civil or criminal

penalties for violating the challenged law.'" Free Libertarian Party, Inc. v. Spano, 314 F. Supp.

3d 444, 452 (quoting Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 689 (2d Cir. 2013)).

And as far as permitting requirements are concerned, "when a licensing statute allegedly vests

unbridled discretion in a government official over whether to permit or deny expressive activity,

one who is subject to the law may challenge it facially without the necessity of first applying for,

and being denied, a license." Id. (quoting City of Lakewood v. Plain Dealer Pub. Co., 486 U.S.

750, 755–56 (1988)). These First Amendment standing requirements entail that there must be an

"objectively reasonable possibility that the ordinance would be applied to [the plaintiff's] own

activities." Sullivan v. City of Augusta, 511 F.3d 16, 26 (1st Cir. 2007).

> *1. 87-4(A)*

Defendants argue that Plaintiffs lack standing to challenge 87-4(A), which sets the time

limit for processing permitting applications, for the fundamental reason that the permitting

requirements would not apply to them and thus pose no possibility of injury. Only gatherings that

meet the statutory definition of "demonstration" require permits, § 87-2(A)–(B), and Defendants

argue that the mode of protest in which Plaintiffs typically engage and plan to engage in the

future does not constitute a "demonstration." Response at 12–13.

Specifically, Defendants argue that Plaintiffs' protests fall outside of this definition in

two ways: (1) they are not organized by twenty-five or more people; and (2) they are not "pre-

planned," see § 87-2(A), but rather are "spontaneous," a term not found in the statute but which

appears to refer to non-"pre-planned" public gatherings, see Response at 12–13.

The Court disagrees with both aspects of Defendants' reading of § 87-2(A). Defendants

argue that the "City's demonstration permit requirements apply only to official groups of

twenty-five of more individuals who have *committed* (i.e., pre-planned) to attend a . . .

demonstration . . . [APEX] is an unincorporated association, with no formal structure, and

composed of two individuals." Response at 12 (internal citations omitted). In other words, under

Defendants' proposed interpretation, twenty-five or more individuals must, in concert, organize a

public gathering in order for their gathering to constitute a "demonstration" to which permitting

requirements apply. But it is evident from the text of the statute that a "demonstration" need not

be *organized by* twenty-five or more people, but rather must be *attended by* twenty-five or more

people. In the statutory definition, which reads, in relevant part, "a pre-planned gathering of 25 or

more persons who are invited or organized by an organizer to convene for the purpose of public

exhibition," § 87-2(A), the adjectival phrase "of 25 or more persons" appears by its placement to

modify "gathering," rather than "organizer." And according to the provision following § 87-2(A),

a singular "person, corporation, partnership or other entity" who organizes a public gathering is

subject to permitting requirements if that gathering is attended by twenty-five or more persons.

See § 87-2(B). The permit application form reinforces this conclusion: to apply for a permit, one

must provide one's name and specify how many people are expected to attend one's planned

demonstration, but one need not state that twenty-four other people have co-organized the

demonstration or committed to attending. See Response, Ex.B. Plaintiffs make clear that they

have organized public gatherings in the past that at least twenty-five people have attended and

that they plan to do so in the future. Plaintiffs' protests thus satisfy this aspect of the statutory

definition of "demonstration."

  While the Court could conceivably be bound by a contrary interpretation, such an

interpretation would have to be authoritative, and Defendants offer no authoritative source

12

supporting their counter-intuitive interpretation of the text. It is true, in the context of substantive First Amendment analysis, that "when a state law has been authoritatively construed . . . or a well-understood and uniformly applied practice has developed that has virtually the force of a judicial construction, the state law is read in light of those limits." City of Lakewood, 486 U.S. at 770 n.11. However, to parse this quote precisely, not any interpretation offered by a defendant's lawyers will do; rather, "to be considered, . . . the state construction and interpretation of the rule must be 'authoritative[],' and the agency's regular practices must have 'virtually the force of a judicial construction.'" Corso v. Fischer, 983 F. Supp. 2d 320, 336 (S.D.N.Y. 2013) (quoting City of Lakewood, 486 U.S. at 770 n.11). The category of "authoritative" sources encompasses "binding judicial [and] administrative construction[s]" and the "well-established" practice of the authority enforcing the ordinance. MacDonald v. Safir, 206 F.3d 183, 191 (2d Cir. 2000). Further, "this Court will presume any narrowing construction or practice to which the law is fairly susceptible." City of Lakewood, 486 U.S. at 770 n.11 (internal quotation marks omitted). In this case, to support their interpretation of § 87-2(A), Defendants offer a construction to which the provision is not naturally susceptible, and at the same time offer nothing more than their say-so in the context of litigation as authority for their proposed interpretation. The Court thus rejects Defendants' interpretation.

Turning to the second part of Defendants' definitional argument against standing, the Court finds a closer question but nevertheless rejects Defendants' interpretation as without grounding in the text and otherwise unauthoritative. Defendants argue that Plaintiffs' past and future protests "are nothing more than spontaneous protests/demonstrations," and that "spontaneous demonstrations," a term absent from the statute, as contrasted with "pre-planned"

13

demonstrations, see § 87-2(A), do not require a permit. Response at 13 (citing Compl. ¶¶ 34–35, 49, 56) (in describing certain past APEX-organized protests, stating that "plaintiffs would have no idea how many people would participate in a counter protest"; "[m]any people would just come [to] the rally without having previously indicat[ed] they would attend"; and "[Plaintiffs have] no idea whether a few people or a few dozen people will assemble and participate"). While Defendants are correct that the statute presumes some distinction between a "pre-planned" and a non-"pre-planned" gathering, the statute neither defines "pre-planned" nor provides any basis for ascertaining whether a gathering qualifies as "pre-planned."

To support their assertion that Plaintiffs' past and intended future protests are not "pre-planned," Defendants rely on an unwritten policy, supposed to be evident in the City's past practice of enforcement over the few months since § 87 was passed, of not requiring permits for "spontaneous" demonstrations. Defendants point to two examples to illustrate this policy—one example of the City requiring a permit and one example of the City not requiring a permit. On May 2, 2020, BLM and an individual affiliated with BLM requested a permit to hold a demonstration on June 5, 2020. Response at 13–14, Ex. B. On an unspecified date, that applicant was granted a permit. Id. By contrast, on May 31, 2020, a protest of over three hundred people that Defendants refer to as "spontaneous" took place. Response at 13. Despite the fact that the protesters had not received a permit, City officials did not impose sanctions under § 87 on anyone involved. Id. Defendants do not specify why this protest qualified as "spontaneous," nor do they provide any facts from which the Court might infer a precise definition of "spontaneous." Id. at 12–13.

This history of enforcement does not constitute an authoritative source for interpreting

14

§ 87, and even if it did, the unwritten policy established by this history is too vague and opaque to undermine Plaintiffs' standing. Fundamentally, this single instance of non-enforcement does not constitute a "well-established" policy on which the Court must rely in interpreting § 87, see MacDonald, 206 F.3d at 191, as the past practice described is constituted by a mere single example of non-enforcement. Moreover, the contours of this policy are not at all clear from the two examples Defendants provide, and based on this history of enforcement, there is an "objectively reasonable possibility" that the statute imposes a permitting requirement on the types of protests Plaintiffs have organized in the past and plan to organize in the future. See Sullivan, 511 F.3d at 26. For instance, to use an example provided by Plaintiffs, when Plaintiffs learned on June 3 of a BLM protest planned for June 5, and intended to organize a counter-protest, Compl. ¶¶ 66–68, it is not clear whether that counter-protest would have been "spontaneous," because it was organized on as little as forty-eight hours notice, or "pre-planned," because it was, after all, planned ahead of time. Any individual who plans a public gathering of substantial size on relatively short notice has cause for concern that she will be sanctioned under § 87 should she not first obtain a permit and endure the 28-day maximum processing period.

Section 87's indeterminate, implied exception for non-"pre-planned" events places the statute in contrast both to local permitting ordinances that contain clearly defined exemptions for spontaneous public gatherings, and to ordinances with a longer history of enforcement capable of generating an ascertainable unwritten policy of exempting spontaneous public gatherings. For instance, in Santa Monica Food Not Bombs v. City of Santa Monica, the Ninth Circuit reviewed a First Amendment challenge to a local ordinance that included an exemption for "[s]pontaneous events which are occasioned by news or affairs coming into public knowledge less than

15

forty-eight hours prior to such event[s]," provided that such events were conducted on the lawn of City Hall. 450 F.3d 1022, 1028 (9th Cir. 2006). If "spontaneous" demonstrations were so explicitly defined in § 87, Defendants might convincingly maintain that Plaintiffs' past protests would have been exempt, but it is not.

In an attempt to establish the existence of an unwritten policy of exempting "spontaneous" demonstrations, defendants present an analogy to a similar unwritten policy that the Seventh Circuit recognized in Thomas. Response at 13 (citing Thomas v. Chicago Park Dist., 227 F.3d 921, 926 (7th Cir. 2000)). But a closer look at the factual record in Thomas reveals that the unwritten policy in that case was defined through a longer history of enforcement, and that its existence was supported at trial by more than one example of non-enforcement. See MacDonald v. Chicago Park Dist., 976 F. Supp. 1125, 1131–32 (N.D. Ill. 1997). And it is important to note that the Supreme Court did not rely on this aspect of the Seventh Circuit's reasoning nor mention such an unwritten policy in its opinion, undermining Defendants' suggestion that their argument is supported by binding Supreme Court precedent. See generally Thomas, 534 U.S. 316.

Moreover, other Courts have found that analogous statutory exceptions for spontaneous demonstrations and unwritten policies of waiving permit requirements for spontaneous demonstrations did not provide meaningful protections, because such provisions and policies were only vaguely defined. See, e.g., American–Arab Anti–Discrimination Comm. v. City of Dearborn, 418 F.3d 600, 607 (6th Cir. 2005) (finding that an unwritten policy of waiving the permit requirement for spontaneous demonstrations did not remedy a lack of narrow tailoring, because the policy was "opaque, and lacking in sufficient notice and standards to guide city officials") (internal quotation marks omitted); Sullivan, 511 F.3d at 39–40 (finding the same with

respect to a statutory provision providing for a "good cause" exception from a 30-day notice requirement); Church of the Am. KKK v. City of Gary, 334 F.3d 676, 682 (7th Cir. 2003) ("The City does have an unwritten policy of waiving the permit requirement for a 'spontaneous' demonstration, but only if the demonstration is 'not planned.' The scope of the dispensation is thus opaque."). The indeterminacy of the unwritten "spontaneous" demonstration exemption in this case is especially pronounced given the young age of § 87, which has precluded the City from developing a "well-established practice" that might clarify the contours of an exception for "spontaneous" demonstrations. See City of Lakewood, 486 U.S. at 770.

Plaintiffs have thus established standing with respect to their First Amendment challenge to § 87-4(A). First, for the reasons explained, § 87's permitting requirements likely apply to the type of protest activity in which they typically have engaged and plan to engage in the future. See Sullivan, 511 F.3d at 26; Lerman, 232 F. 3d at 144. And insofar as Plaintiffs allege that § 87-4(A) is facially unconstitutional due to its vesting unbridled discretion in City officials with respect to the timing of their response to a permit application, it is well-established that Plaintiff need not first apply for a permit before bringing suit. Nat'l Org. for Marriage, Inc., 714 F.3d at 689. It is sufficient that Plaintiffs allege that they presently are engaging in self-censorship out of aversion to the burden of a delay that allegedly amounts to censorship. And Plaintiffs plausibly allege that they are self-censoring: the only way for them to organize a demonstration anywhere in Glens Falls without enduring the allegedly unconstitutional delays in the permitting process imposed by the statute is by risking likely criminal sanctions for an unpermitted protest. See Sugarman, 192 F. Supp. 2d at 289 (holding that the threat of enforcement of a sign ordinance is "precisely the type of harm, that of self-censorship, that has led courts to relax traditional

17

standing requirements"); Am. Booksellers Found. v. Dean, 342 F.3d 96, 101 (2d Cir. 2003) (finding standing because a statute "present[ed] plaintiffs with the choice of risking prosecution" or forgoing purportedly protected First Amendment activity).

Moreover, Plaintiffs have alleged more than a "mere profession of an intent, some day," to engage in the activity at issue (namely, engaging in a pre-planned protest of at least twenty-five people on outdoor public property in Glens Falls), which the Supreme Court has found insufficient absent a "description of concrete plans, or indeed even any specification of when the some day will be," Lujan, 504 U.S. at 564, 564 n.2 (internal quotation marks omitted). Rather, Plaintiffs' intent to organize statutory "demonstrations" in the future is credibly supported by facts indicating a history of doing so and specific plans to persist in this activity: Plaintiffs have commonly organized protests and counter-protests of at least twenty-five people in the past in public areas regulated by § 87, often on less than twenty-eight days notice; they have on a specific occasion refrained from protesting because the 28-day maximum review period precluded a counter-protest planned two days ahead of time, after taking concrete steps to prepare for that protest; and they intend to organize protests in Glens Falls in the future (indeed, it is APEX's mission to do so), including a specifically described protest in support of police, Trump, and Stefanik that due to its topical nature must take place fewer than twenty-eight days from the filing of the Complaint.

   *2. 87-4(A)(13)*

Plaintiffs have standing to challenge § 87-3(A)(13), which prohibits "signs," because its application would ensure the suppression of any speech conveyed via signs at a demonstration. At the time of filing, Plaintiffs planned to display political signs at an upcoming protest in

18

opposition to BLM, Compl. ¶¶ 70, 80, conduct that is allegedly prohibited and punishable by fine. The real threat of enforcement of the anti-sign provision thus establishes standing, as Plaintiffs must self-censor or risk sanctions that clearly apply to allegedly protected First Amendment conduct involving signs. See Sugarman, 192 F. Supp. 2d at 289. In fact, § 87-3(A)(13) prohibits the use of signs at both "pre-planned" and non-"pre-planned" public gatherings. Curtis Decl. ¶ 5.[4] Thus, even if Plaintiffs participate in a non-"pre-planned" demonstration for which they in theory need not obtain a permit, they will still be subject to the anti-sign rule. This eliminates the contingency that Plaintiffs must participate in a gathering that is "pre-planned" to be subject to the prohibition on signs and thus makes the possibility of injury even less speculative for purposes of standing than the injury from § 87-4(A).

### 3. Section 87-4(B)(3)

E.S., a minor, challenges § 87-4(B)(3) via "next friend" Sherman. Defendants argue that E.S., who can only bring this suit through an appropriate representative, cannot assert claims through Sherman, and that Sherman lacks third-party standing to assert claims on E.S.'s behalf. Response at 15–16. In their Reply, Plaintiffs do not contest this argument. See generally Reply. Defendants are correct, and no Plaintiff in this action has standing to challenge § 87-4(B)(3).

---

[4] Curtis's interpretation of § 87-3(A)(13) as applying to non-"pre-planned" gatherings has a textual basis. Section 87-3 is titled "Prohibited items and activities," thus containing in its title no reference to "demonstrations." § 87-3. Section 87-3 specifies that certain "items or activities are prohibited except for use by law enforcement," § 87-3, again without reference to "demonstrations." While some items in this list contain explicit references to "demonstrations," see, e.g. § 87-3(A)(1) ("Alcoholic beverages in any open container cannot be carried or possessed by participants *of the demonstration*.") (emphasis added); § 87-3(A)(7) ("No *demonstration* shall cause physical injury to persons or property, whether public or private.") (emphasis added), § 87-3(A)(13) contains no such reference, see § 87-3(A)(13) ("Signs. As defined in the City Code, Chapter 180, Signs.").

A minor normally lacks the capacity to bring suit for herself. See, e.g., N.Y. C.P.L.R. 1201 (requiring in the context of legal representation in New York state courts, that "an infant shall appear by the guardian of his property or, if there is no such guardian, by a parent having legal custody, or, if there is no such parent, by another person or agency having legal custody, or, if the infant is married, by an adult spouse residing with the infant . . ."); Fed. R. Civ. P. 17(b)(1) (providing that the capacity of an individual to sue is determined by "the law of the individual's domicile"); see also Berrios v. N.Y. City Hous. Auth., 564 F.3d 130, 134 (2d Cir. 2009). "F.R.C.P. 17(c) provides that a minor or incompetent person may be represented by a general guardian, a committee, a conservator, or a similar fiduciary," see Berrios, 564 F.3d at 134 (citing Fed. R. Civ. P. 17(c)(1)), and that

> [a] minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court must appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action.

Fed. R. Civ. P. 17(c)(2). Thus, "the court is not to reach the merits without appointing a suitable representative." Berrios, 564 F.3d at 134.

Sherman bears the burden to establish that she is a suitable next friend. Whitmore v. Arkansas, 495 U.S. 149, 163–64 (1990) (explaining that the burden is on the "next friend" to establish that she is "truly dedicated to the best interests of the person on whose behalf he seeks to litigate," and that some courts also require the "next friend" to "have some significant relationship with the real party in interest"). The Complaint contains no allegations concerning Sherman's suitability as a next friend. See generally Compl. Accordingly, the Court declines to recognize Sherman as a suitable next friend.

20

Plaintiffs also allege no facts that would tend to support any plaintiff's third-party standing to assert claims on E.S.'s behalf. See generally Compl. In general, a party may not assert the rights of third parties in litigation. See Rivers v. McLeod, 252 F.3d 99, 102 (2d Cir. 2011). Because Plaintiffs have neither alleged facts that would support third-party standing nor addressed this point in their briefing, the Court finds that no plaintiff has third-party standing to challenge § 87-4(B)(3) on E.S.'s behalf.

### B. Preliminary Injunction

#### 1. Irreparable Harm

"Violations of the First Amendment are presumed irreparable." Tunick v. Safir, 209 F.3d 67, 70 (2d Cir. 2000). The Supreme Court has declared that "the loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Bery, 97 F.3d at 693 ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction."); Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) ("[W]hen an alleged deprivation of a constitutional right is involved, . . . no further showing of irreparable injury is necessary.").

In this case, "the very nature of [Plaintiffs'] allegations" satisfies the requirement that they show irreparable injury. Bery, 97 F.3d at 694. Since Plaintiffs allege that § 87 abridges their rights of speech and association under the First Amendment, "the dispute on the motion [for a preliminary injunction] is whether Plaintiff[s] can satisfy the second prong o[f] the preliminary injunction standard." Burritt v. New York State Dep't of Transp., No. 08-CV-605, 2008 WL 5377752, at *1 (N.D.N.Y. Dec. 18, 2008).

*2. Likelihood of Success on the Merits*

Because Plaintiffs seek to stay "government action taken in the public interest pursuant to a statutory or regulatory scheme," see Mastrovincenzo, 435 F.3d at 89, and because they seek a "prohibitory" rather than "mandatory" stay, see Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989), the "likelihood of success on the merits" standard applies—nothing less and nothing more.

Plaintiffs seek a "prohibitory" rather than a "mandatory" stay. Plaintiffs seek to prevent the enforcement of a permitting scheme, a requirement that "clearly does not command the [Defendants] to perform any specific tasks." See Mastrovincenzo, 435 F.3d at 90 (holding that an injunction against the enforcement of a licensing scheme was "prohibitory"). Thus, Plaintiffs are not subject to the heightened "'clear' or 'substantial' likelihood of success on the merits" standard. See id. (quoting No Spray Coalition, Inc., 252 F.3d at 150).

And because Plaintiffs seek to enjoin the enforcement of a governmental permitting scheme, the "likelihood of success on the merits" standard applies, rather than the more lax "serious questions" standard. See Bery, 97 F.3d at 694 (applying the higher "likelihood of success on the merits" standard to a motion to enjoin enforcement of city regulation prohibiting unlicensed public exhibits of visual art). The former standard is appropriate because "there are public interest concerns on both sides," see Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 923 (2d Cir. 1997): Defendants seek to ensure public safety, and Plaintiffs seek to exercise constitutionally protected liberties.

22

a. Applicable First Amendment Standards

First Amendment standards governing licensing and permitting schemes requiring prior

government authorization to engage in speech are related to the doctrine of prior restraint. See

Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 131 (1992) (referring to licensing

schemes for speech as a form of prior restraint); Lusk v. Village of Cold Spring, 475 F.3d 480,

485 (2nd Cir. 2007) ("A law requiring prior administrative approval of speech falls within the

prior restraint rubric"); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* (4th Ed.

2011), 978–79, 993 (explaining that a rule requiring some form of license or permit before one

may engage in expression is a prior restraint on speech). Permitting and licensing schemes, even

when content-neutral, must comport with certain First Amendment restrictions. Specifically,

content-neutral licensing and permitting schemes (1) must contain adequate standards to guide

the official's decision, (2) must be narrowly tailored to serve a significant government interest,

and (3) must leave open ample alternatives for communication. Thomas, 534 U.S. at 323, 323

n.3; see also "Q" Lungian Enters. v. Town of Windsor Locks, 272 F. Supp. 3d 289, 300 (D.

Conn. 2017); H.D.V.-Greektown, LLC v. City of Detroit, 568 F.3d 609, 623 (6th Cir. 2009).

These requirements are conjunctive, and the failure to meet any one of them violates the First

Amendment. See Kuba v. 1-A Agr. Ass'n, 387 F.3d 850, 858 (9th Cir. 2004) ("The failure to

satisfy any single prong of this test invalidates the [law].").

*i. Unbridled Discretion*

First, permitting and licensing schemes cannot place unbridled discretion in the hands of

government officials. See FW/PBS v. City of Dallas, 493 U.S. 215, 225–26 (1990) (O'Connor,

J.) (plurality opinion). "Two lines of cases have sprouted in this soil: one focused on the

substantive criteria that restrain official discretion and the other on procedural safeguards." New Eng. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 21 (1st Cir. 2002). Substantively, ordinances must contain "narrow, objective, and definitive standards to guide the licensing authority." Forsyth Cty., 505 U.S. at 130. The requirement applies both to content-based prior restraints and to content-neutral time, place, and manner regulations. See Kinton, 284 F.3d at 21 (citing Thomas, 534 U.S. at 323). "Without these guideposts, post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." City of Lakewood, 486 U.S. at 758.

The landmark case detailing procedural restraints on official discretion is Freedman v. Maryland, 380 U.S. 51 (1965). In Freedman, the Supreme Court ruled, in the motion picture licensing context, that prior restraints must meet certain procedural requirements: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." Thomas, 534 U.S. at 321 (quoting FW/PBS, Inc., 493 U.S. at 227). In Thomas, the Supreme Court held that certain of Freedman's procedural requirements do not apply to permitting schemes that eschew any consideration of the content of speech. Thomas, 534 U.S. at 323. Specifically, such regulatory schemes need not include any deadline for judicial review and they need not require that the government initiate litigation in order to deny a permit. Id. at 321 ("Petitioners contend that the Park District, like the Board of Censors in Freedman, must initiate litigation every time it denies a permit and that the ordinance

24

must specify a deadline for judicial review of a challenge to a permit denial. We reject those contentions.").

Several other holdings in Thomas are relevant to the issue of official discretion in a permitting context. Thomas held, first, that the type of permitting scheme at issue in that case was a content-neutral licensing scheme. Id. at 322. Second, as discussed, Thomas held that content-neutral licensing schemes are not subject to the same First Amendment standards as content-based licensing schemes. Id. at 323. Third, under Thomas, because even a content-neutral regulatory scheme "can be applied in such a manner as to stifle free expression," the Constitution still requires that it "contain adequate standards to guide the official's decision and render it subject to effective judicial review." Thomas, 534 U.S. at 323. Thomas held that the Chicago park ordinance did not violate the First Amendment by vesting unbridled discretion in city officials, because it provided that a permit could only be denied for a non-exclusive list of sufficiently "specific and objective" reasons, because "the Park District must process applications within 28 days," and because the Park district "must clearly explain its reasons for any denial." Id. at 324.

Hence, post-Thomas, it remains the case that content-neutral permitting schemes must not vest unbridled discretion in permitting authorities. "A government regulation that allows arbitrary application 'is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" Forsyth Cty, 505 U.S. at 130 (quoting Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 649 (1981)). To curtail that risk, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow,

objective, and definite standards to guide the licensing authority." Id. (quoting Shuttlesworth v.

Birmingham, 394 U.S. 147, 150–51 (1969)).

*ii. Narrow tailoring*

Under Thomas, content-neutral permitting and licensing schemes not only must

sufficiently cabin official discretion, but also "must be narrowly tailored to serve a significant

governmental interest." Thomas, 534 U.S. at 323 n.3; see also H.D.V.-Greektown, 568 F.3d at

623 (noting that the "Supreme Court held in [Thomas] that an ordinance . . . must be narrowly

tailored to serve a significant government interest[.]"). First Amendment jurisprudence

establishes some guideposts in this analysis. See Cuviello v. City of Vallejo, 944 F.3d 816, 828

(9th Cir. 2019).

First, the Court should consider "whether the regulation achieve[s] its ends without

restricting substantially more speech than necessary." Id. at 829 (internal quotation marks

omitted); Frisby v. Schultz, 487 U.S. 474, 485 (1988) (noting that a content-neutral

ordinance "is narrowly tailored if it targets and eliminates no more than the exact source of the

'evil' it seeks to remedy"). Time, place, and manner restrictions burden substantially more

speech than necessary, for instance, when they are "geographically overinclusive." Id.; see also

Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 949 (9th Cir.

2011) (holding that an ordinance barring individual solicitation on all streets and highways was

not narrowly tailored to further the city's interest in preventing traffic problems, while suggesting

that the city might be able to justify the ban on this basis if it were restricted to major streets and

medians); cf. Grayned v. City of Rockford, 408 U.S. 104, 119 (1972) (finding an anti-noise

ordinance not to be geographically overinclusive because it only applied within 150 feet of a

26

school building).

Time, place, and manner restrictions can also burden substantially more speech than necessary by imposing excessive delays in a blanket manner that provides insufficient outlets for expression that by its nature must occur on short notice to achieve its ends. See, e.g., Sullivan, 511 F.3d at 39 (invalidating a 30-day notice requirement for public gatherings as insufficiently narrowly tailored, reasoning that while a city's "interest in having advance notice of a parade in order to control traffic, prevent scheduling conflicts, ensure adequate facilities are available, and assign personnel to safely close the streets" are "entitled to due weight," the First Amendment "require[s] the City in time sensitive situations to accommodate proposed parades and marches much more quickly than within thirty days"); American–Arab Anti–Discrimination Comm., 418 F.3d at 605–07 (acknowledging "a significant interest in providing for traffic and crowd control, property maintenance, and protection of the public welfare" but invalidating a 30-day notice period for lack of narrow tailoring due to its tendency to suppress spontaneous speech and evidence that the city had in the past accommodated public gatherings on shorter notice).

Second, while a municipality need not justify its ordinance as the *least* restrictive alternative, see Ward v. Rock Against Racism, 491 U.S. 781, 796, 798 (1989), the possibility of alternative means toward the government's ends is relevant, and the Court should consider "whether there are obvious alternatives that would achieve the same objectives with less restriction on speech." Cuviello, 944 F.3d at 829 (internal quotation marks omitted).

*iii. Leaving open ample alternatives for communication*

Under Thomas, content-neutral permitting and licensing schemes must "leave open ample alternatives for communication." Thomas, 534 U.S. at 323; see also H.D.V.-Greektown, 568

27

F.3d at 623 (noting that the "Supreme Court held in [Thomas] that an ordinance . . . must leave

open ample alternatives for communication"). "While the First Amendment does not guarantee

the right to employ every conceivable method of communication at all times and in all places, a

restriction on expressive activity may be invalid if the remaining modes of communication are

inadequate." Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466

U.S. 789, 812 (1984); City of Ladue v. Gilleo, 512 U.S. 43, 56 (1994) ("[E]ven regulations that

do not foreclose an entire medium of expression, but merely shift the time, place, or manner of

its use, must leave open ample alternative channels for communication."); see also D.H.L.

Assocs., Inc. v. O'Gorman, 199 F.3d 50, 59 (1st Cir. 1999) ("The essence of this question is not

whether a degree of curtailment of speech exists, but rather whether the remaining

communicative avenues are adequate.") (internal quotation marks omitted). Because there must

be alternative avenues of expression of a certain quality, it goes without saying that restrictions,

even if content-neutral, that completely foreclose an entire medium of expression tend to violate

the First Amendment. See City of Ladue, 512 U.S. at 55 ("Although prohibitions foreclosing

entire media may be completely free of content or viewpoint discrimination, the danger they pose

to the freedom of speech is readily apparent—by eliminating a common means of speaking, such

measures can suppress too much speech.").

b.  Application to § 87

The permitting scheme at issue in this case, like that in Thomas, is a content-neutral

scheme. Plaintiffs do not allege that the substantive criteria by which permit applications are

adjudicated requires city officials to pass judgment on the content of speech. See generally Pls.'

Mem. of Law; Thomas, 534 U.S. at 322. Indeed, given the similarities between the substantive

28

criteria in this statute and the ordinance at issue in Thomas, such a characterization of the law

would likely be unconvincing. Moreover, analogously to the ordinance in Thomas, § 87, at least

in its permit processing timing provision, "is not even directed to communicative activity as

such, but rather to all activity conducted [on public property]." Id.

Consequently, Plaintiffs' First Amendment claims are governed by the standards

recognized in Thomas. However, because the two ordinances differ in relevant ways, and

because Plaintiffs challenge different sorts of provisions on different grounds, Thomas is

distinguishable, and Plaintiffs have accordingly shown a likelihood of success with respect to

their challenges to some provisions of § 87.

### i.  Section 87-4(A)

Plaintiffs challenge § 87-4(A) under the First Amendment on three separate grounds, each

of which would be independently sufficient to justify enjoining the provision: that § 87-4(A) is

not narrowly tailored, that it does not leave open ample alternative channels of communication,

and that it vests unbridled discretion in city officials. The Court enjoins the provision on all three

grounds.

Plaintiffs do not contest that there are significant governmental interests served by § 87.

See Pls.' Mem. of Law at 18 ("The preamble to § 87 identifies public safety as the interest that

supposedly justifies the City's prior restraint of speech . . . Certainly, public safety is an

important governmental interest."). More specifically, Defendants identify governmental interests

in ensuring the safety of participants in public gatherings, pedestrian bystanders, and drivers of

vehicles on the streets of Glens Falls, and in managing traffic. Curtis Decl. ¶¶ 12, 14; Lydon

Decl. ¶ 4.[5]

Plaintiffs argue that § 87-4(A) is not narrowly tailored, because it applies the 28-day

permit processing period in a blanket fashion, to all demonstrations, including spontaneous

demonstrations that are uniquely censored through delay. A delay in granting a permit to engage

in a demonstration can amount to censorship, regardless of whether the permit is ultimately

granted or denied. When a speaker "wishes to take a public position on a pressing public issue . .

. the time required to obtain approval may prevent him or her from doing so until after the public

issue is settled[.]" Lusk, 475 F.3d at 492. Plaintiffs cite to numerous cases in which courts have

invalidated advance notice requirements (requiring that demonstrators apply for a permit a

certain amount of time prior to an intended demonstration) of comparable length on the ground

that such requirements censored spontaneous speech and were not narrowly tailored to meet

similar public safety concerns to those at issue in this case. See Pls.' Mem. of Law at 19–20; see

also Sullivan, 511 F.3d at 39 (invalidating a 30-day notice requirement for public gatherings as

insufficiently narrowly tailored, reasoning that while a city's "interest in having advance notice

of a parade in order to control traffic, prevent scheduling conflicts, ensure adequate facilities are

---

[5] Defendants also highlight public safety concerns related to the possession and use of certain items at protests, such as bullhorns and firearms. Lydon Decl. ¶¶ 8–9. The Court does not discuss those concerns here, because they are addressed by provisions of § 87-3 that Plaintiffs do not directly challenge and that are left in effect subsequent to this order. See, e.g. § 87-3(A)(14) ("Sirens or air horns. No person shall use, carry or possess any hand carried or vehicle-mounted siren or air horn."); § 87-3(A)(17) ("Firearms are prohibited, except for those displayed by participants in the Memorial Day parade and those used by active duty law enforcement personnel."). Defendants also point to special dangers posed by protests in the Glens Falls Centennial Circle traffic circle. Lydon Decl. ¶ 5–6. The Court does not discuss those concerns here either, because there is a specific provision prohibiting protests in that area, see § 87-3(A)(19) ("There shall be no Demonstrations conducted in the public areas known as Centennial Circle and the Civil War Monument within five feet of the roadway."), a provision that Plaintiffs do not directly challenge and that is left in effect subsequent to this order.

available, and assign personnel to safely close the streets" are "entitled to due weight," the First

Amendment "require[s] the City in time sensitive situations to accommodate proposed parades

and marches much more quickly than within thirty days"); American–Arab Anti–Discrimination

Comm., 418 F.3d at 605–07 (acknowledging "a significant interest in providing for traffic and

crowd control, property maintenance, and protection of the public welfare" but invalidating a 30-

day notice period for lack of narrow tailoring due to its tendency to suppress spontaneous speech

and evidence that the city had in the past accommodated public gatherings on shorter notice);

Western Region v. City of Richmond, 743 F.2d 1346, 1357 (9th Cir. 1984) (noting that "all

available precedent suggests that a 20-day advance notice requirement is overbroad").

   As a somewhat academic point, the statutory 28-day wait period at issue in this case is a

permit processing period, not an advance notice requirement. But these types of provisions

should be subject to the same analysis in this context, because they pose an equivalent threat to

spontaneous expression, as both require a delay before engaging in a public demonstration. At

least one court of appeals has assumed that the two types of provisions are subject to the same

analysis in this context. Sullivan, 511 F.3d at 39 n.13 (likening the 30-day advance notice

requirement at issue in that case to the 28-day processing period in Thomas, and distinguishing

Thomas on the basis that the 28-day processing period was not directly challenged in that case).

Moreover, courts in numerous cases have acknowledged the general truism that the delay of

administrative processing can burden spontaneous speech. See, e.g., Watchtower Bible & Tract

Soc'y of New York, Inc. v. Vill. of Stratton, 536 U.S. 150, 166 (2002) (finding that a permitting

ordinance "effectively banned" spontaneous speech due to the delay inherent in obtaining

government approval since "[a] person who made a decision on a holiday or a weekend to take

an active part in a political campaign could not begin to . . . [engage in political speech] until

after he or she obtained the required permit."); Community for Creative Non-Violence v. Turner,

714 F. Supp. 29, 32–33 (D.D.C. 1989) (holding that a regulation providing that permits may be

obtained only at a government office either in person or by mail during normal business hours

burdened spontaneous speech by creating a "built-in delay mechanism that prevents the timely

exercise of First Amendment rights"), aff'd in part, rev'd in part on other grounds, 893 F.2d 1387

(D.C. Cir. 1990); Grossman v. City of Portland, 33 F.3d 1200, 1204, 1206 (9th Cir. 1994)

(holding that due to the delay entailed by a maximum 7-day processing period, "immediate

speech can no longer respond to immediate issues," and spontaneous expression is thus

"prohibited by the ordinance"); Cuviello, 944 F.3d at 832 (noting in invalidating a provision

requiring a 10-day processing time for an amplification permit that "[b]oth the procedural hurdle

of filling out and submitting a written application, and the temporal hurdle of waiting for the

permit to be granted may discourage potential speakers") (quoting Grossman, 33 F.3d 1200 at

1206). Additionally, the Second Circuit has held in an analogous context that a provision that in

effect imposed a sign permit processing period as long as seventy-five days was overbroad due to

its burden on spontaneous speech. See Lusk, 475 F.3d at 491–93 ("Where, as here, a property

owner wishes to take a public position on a pressing public issue . . . the time required to obtain

approval may prevent the property owner from doing so until after the public issue is settled . . .

Such belated approval is of little consolation to Lusk and those like him in this regard, and of

little use to their neighbors or the political process").

   The truism that administrative processing imposes delays that burden spontaneous speech

is highlighted by the example permit application that Defendants attach as an exhibit to their

Response. See Response, Ex. B. The person who filed this application, who sought to hold a

protest on June 5, 2020, filed on May 2, 2020. Id. Practically, a prospective protester must file

this long in advance to ensure that she is able to protest on her planned date, because she must

account for the possibility that her application will take 28 days to be approved (assuming that it

does not need to be revised, which will lengthen the processing period by seven days, see § 87-

4(C), and assuming that the application is not denied, necessitating an administrative appeal that

likewise lasts seven days, § 87-4(E)).

Defendants contend that Plaintiffs' First Amendment challenge to § 87-4(A) is foreclosed

by Thomas, which upheld a statute with an equivalent permit processing provision. Response at

7. What Defendants overlook is that the plaintiffs in Thomas did not challenge any aspect of the

Chicago park ordinance on the ground that it was not narrowly tailored, and the Supreme Court

accordingly did not make any holding on this point with respect to the permit processing timing

provision or any other provision. See Thomas, 534 U.S. at 323 n.3 ("Petitioners do not argue that

the Park District's ordinance fails to satisfy other requirements of . . . time, place, and manner

jurisprudence, under which the permit scheme must not be based on the content of the message,

must be narrowly tailored to serve a significant governmental interest, and must leave open

ample alternatives for communication.").

Defendants argue that the small physical size of Glens Falls (3.8 square miles) and the

small size of its police force (thirty officers) justifies a longer permit-processing period than

might be constitutional in a larger city. See Response at 10. To the extent that Glens Falls'

relatively small police force allows it to accommodate fewer simultaneous protests on short

notice than, say, Chicago, it still seems implausible that twenty-eight days of preparation time for

any protest anywhere in the town is justified by this resource limitation. See Douglas v.

Brownell, 88 F.3d 1511, 1523 (8th Cir. 1996) (rejecting defendants' argument that "the City's

limited resources and small police force" justified a 5-day notice requirement for parades,

because its effect of barring spontaneous speech rendered it insufficiently narrowly tailored);

NAACP v. City of Richmond, 743 F.2d 1346, 1357 (9th Cir. 1984) (finding that there is "no

basis in logic for cities to demand notice far in advance of parades. Policemen and newsmen are

frequently deployed on less than two days notice") (citing Vince Blasi, *Prior Restraints on*

*Demonstrations*, 68 MICH. L. REV. 1482, 1526 (1970)). While Defendants do not explicitly argue

as much, it is conceivable that the relatively limited staff and resources devoted to processing

applications could necessitate longer processing times than in, for instance, Chicago, if there

were a substantial number of permit applications for Glens Falls officials to review. But

Defendants point to only a single permit application filed in the several months since the

ordinance was passed. See Response, Ex. B, and do not otherwise suggest that the Glens Falls

government has been inundated with permit requests, see generally Response.[6]

　　　Defendants also, as discussed above, offer an interpretation of § 87-2(A) according to

_____

　　[6] The Seventh Circuit in Thomas upheld a 30-day notice period in the Chicago park
ordinance. But as the court stated in that case, and as it clarified in a later case, that holding in
Thomas was based on evidence that the permitting authority was inundated with thousands of
requests. See Thomas, 227 F.3d at 925–26 ("The park district requires that applications for
permits be filed 30 days in advance—60 days if special facilities are to be involved, such as
sound amplification, which unless limited can violate the city's noise ordinance. The plaintiffs
argue that these periods are too long and inhibit rallies responding to fresh news and startling
events. But since thousands of permit applications are filed with the park district every year, it
would be burdensome to require the park to process the applications in a significantly shorter
time."); Church of the Am. KKK, 334 F.3d at 683 ("It is true that in [Thomas] we upheld a
30-day advance-notice requirement . . . for rallies and demonstrations in Chicago parks. But we
did so on the basis of evidence that the authorities were being overwhelmed by thousands of
applications.") (internal citations omitted).

which permitting requirements do not apply to protests considered to be "spontaneous" for First

Amendment purposes, rendering § 87-4(A) narrowly tailored in this respect. See Response at

12–13. This construction of § 87-2(A), if authoritative, might undermine Plaintiffs' First

Amendment challenge to § 87-4(A) on the basis that it is not narrowly tailored. But for the

reasons discussed above in the context of standing analysis, the Court rejects Defendants'

proposed construction. Defendants' construction is not supported by the text, which contains

only a vague, implied exemption for non-"pre-planned" public gatherings, without anywhere

defining the term "pre-planned." Based on the text, is not at all clear from the statute whether a

protest planned a day, or two days, or a week in advance, which might be "spontaneous" for

purposes of narrow tailoring analysis, see Church of the Am. KKK, 334 F.3d at 682 (noting that

"Courts . . . point out that requiring even a short period of advance notice prevents spontaneous

demonstrations"); Douglas, 88 F.3d at 1523 (invalidating a blanket 5-day notice requirement due

to its burden on spontaneous expression), would be exempted from the permitting requirements.

Moreover, as discussed, Defendants' construction is not supported by any policy of exempting

"spontaneous" protests from the permitting requirements, as this purported unwritten policy is

neither "well-established," see MacDonald, 206 F.3d at 191, nor sufficiently definite as to

provide any clarity beyond that provided by the text of § 87-2(A).[7]

    Church of the Am. KKK v. City of Gary provides the closest parallel on this point. In that

---

[7] Moreover, as Plaintiffs rightly argue, the vagueness of this rule itself tends to chill speech. See Reply at 3 ("[W]here 'a statute's literal scope' implicates the First Amendment[,] the void-for-vagueness doctrine 'demands a greater degree of specificity than in other contexts.'") (quoting Smith v. Goguen, 415 U.S. 566, 573 (1974)); see also id. ("When a statute regulates speech, like § 87, any uncertainty in its 'meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.'") (ellipses in original) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108–09 (1972)).

case, the local ordinance at issue required that anyone seeking to conduct a parade apply for a

permit forty-five days in advance. 334 F.3d at 682 (7th Cir. 2003). The court noted that the city

had an unwritten policy of "waiving the permit requirement for a 'spontaneous' demonstration,

but only if the demonstration is 'not planned.'" Id. at 682. The Seventh Circuit found that this

unwritten policy was not sufficiently defined to provide assurances that protests planned on short

enough notice to qualify as "spontaneous" for First Amendment purposes would be exempted

from the permit requirement. Id. Other courts have reached similar conclusions in analogous

circumstances. See, e.g., American-Arab Anti–Discrimination Comm., 418 F.3d at 607 (finding

that an unwritten policy of waiving the permit requirement for spontaneous demonstrations did

not remedy a lack of narrow tailoring, because the policy was "opaque, and lacking in sufficient

notice and standards to guide city officials") (internal quotation marks omitted); Sullivan, 511

F.3d at 39–40 (finding the same with respect to a statutory provision providing for a "good

cause" exception from a 30-day notice requirement). This Court finds the same.

       If Defendants wish to cure a lack of narrow tailoring in the statute by exempting

"spontaneous" demonstrations, they could do so by revising the statute, see, e.g., Santa Monica

Food Not Bombs, 450 F.3d at 1028 (upholding a permitting statute that provided an exemption

for "[s]pontaneous events which are occasioned by news or affairs coming into public knowledge

less than forty-eight hours prior to such event[s]," provided that such events were conducted on

the lawn of City Hall), or by publishing some authoritative guidance specifying who exactly is

exempted from permitting requirements. But they cannot do so by inventing an implausible

construction of the statute in a brief filed in this lawsuit, nor by relying an unwritten policy that

has not fully formed through a longer history of implementation.

Accordingly, § 87-4(A) is likely invalid, because it is not narrowly tailored.

Plaintiffs also contend that § 87-4(A) does not leave open ample alternative channels of communication, because it applies to all public property in Glens Falls, leaving no alternative outlet within city limits for a prospective protester deterred by the 28-day permit processing period. As support for this argument, Plaintiffs cite Bery v. City of New York (2d Cir. 1996), in which street artists challenged a street vending ordinance requiring a license for the sale of all non-food goods, including art, anywhere on public property in New York City. 97 F.3d at 692. The Bery court assumed without deciding that the ordinance was content neutral, but found that the regulation was still likely unconstitutional and granted the plaintiffs' motion for a preliminary injunction, because, like § 87-4(A), the vending regulation applied to all outdoor public property, and thus did not leave open ample alternative channels for expression. Id. at 696–99. See also Lusk, 475 F.3d at 492 (reasoning in invalidating a sign permitting ordinance's permit-processing timing provision, that "the ordinance's constitutionality hinges, then, on whether [the] licensing scheme is deficient because it requires residents to wait [75 days] before being permitted to post . . . a sign. We conclude that it is. It remains an impermissibly broad ban on such speech, at least for the time").

Defendants again rely on Thomas. Response at 5–7. But § 87 crucially differs from the ordinance at issue in Thomas, because while § 87 applies to all outdoor public property, the Chicago ordinance applied only to public parks. Indeed, the opinion is pervaded with language emphasizing this point. See Thomas, 534 U.S. at 322 ("[T]he object of the permit system . . . [is] to coordinate multiple uses of limited space, to assure preservation of the *park facilities*, to prevent uses that are dangerous, unlawful, or impermissible under the *Park District's* rules, and

37

to assure financial accountability for damage caused by the event . . . To allow unregulated access to all comers could easily reduce rather than enlarge the *park's* utility as a forum for speech.") (emphasis added) (internal quotation marks omitted). Unlike the plaintiffs in Thomas, people who seek to engage in a "demonstration" in Glens Falls that addresses a topical issue that will expire in less than twenty-eight days as a practical matter cannot do so, because they must take into account the real possibility that a permit will not be granted until twenty-eight days have passed; and such organizers cannot circumvent this wait period by using some alternative public location beyond the reach of § 87-4(A). See Feed the Children, Inc. v. Metro. Gov't of Nashville, 330 F. Supp. 2d 935, 947 (M.D. Tenn. 2002) (noting in invalidating an ordinance requiring a permit for solicitation on all public property in a locality that "[t]he ordinance is unlike the ordinance at issue in Thomas . . . In Thomas, unlike in the case at bar, an unsuccessful applicant could use any location other than the park and could use whatever method of communication it wanted. In this case, an unsuccessful applicant may not solicit at any location in Davidson County by any means"). Moreover, as noted, the Supreme Court in Thomas did not review a First Amendment challenge to the Chicago park ordinance on the basis that any provision of the ordinance foreclosed ample alternative channels of communication. See Thomas, 534 U.S. at 323 n.3.

Defendants also argue that the small geographic size of Glens Falls, combined with the small size of the Glens Falls police force, justify a longer wait period. Response at 10. Defendants cite no authority for the principle that the smaller the town, the greater the percentage of a town's surface area a permitting ordinance may cover, and the Court is aware of none. Members of the public may, for a variety of reasons, seek to hold demonstrations in Glens Falls

rather than in other towns, which contain the only outdoor public places in which § 87-4(A) does

not apply. Under the First Amendment, prospective protesters who wish to speak their mind on

urgent matters must have ample alternative avenues for expression within the town of Glens

Falls.

Accordingly, § 87-4(A) is likely invalid, because it is does not leave open ample

alternative channels of communication.

Finally, Plaintiffs argue that § 87-4(A) grants unbridled discretion to city officials, as it

lacks any criteria governing the decision of when to respond to a permit application. See Pls.'

Mem. of Law at 14–17. Plaintiffs argue that "[t]he clerk may issue the permit immediately or

wait the full twenty-eight days. The clerk may do this for any reason at all and has no obligation

to explain any want of alacrity." Indeed, under § 87-4(A), there are *no* standards constraining the

exercise of discretion in the decision to delay a permit beyond fourteen days, let alone "narrow,

objective, and definite" ones, see Heffron, 452 U.S. at 649, and the clerk is required only to

provide notice of, and not to explain, a delay beyond fourteen days. Section 87-4(A) states simply

that an application will be processed in fourteen days or, with notice, in up to twenty-eight days.

§ 87-4(A). Such limitless discretion is prohibited under the First Amendment, because "it allows

officials to suppress viewpoints in surreptitious ways that are difficult to detect." Amidon v.

Student Ass'n, 508 F.3d 94, 103 (2d Cir. 2007). A politically biased Glens Falls government

employee could, entirely undetected, hinder an applicant's political activism by unnecessarily

delaying an application for up to twenty-eight days, without justifying this decision by reference

to any statutory standards.

Defendants again rely on Thomas, Response at 6–7, and in this, they raise a closer

question than in their other appeals to <u>Thomas</u>. In <u>Thomas</u>, the Supreme Court reviewed a challenge to Chicago's permitting ordinance on the ground that it granted unbridled discretion to city officials in their decision to grant or deny a permit. <u>Thomas</u>, 534 U.S. at 323. The Supreme Court held that the Chicago park ordinance did not violate the First Amendment by vesting unbridled discretion in city officials in this respect, because the ordinance provided that a permit could only be denied for a non-exclusive list of sufficiently "specific and objective" reasons, because "the Park District must process applications within 28 days," and because the Park district "must clearly explain its reasons for any denial." <u>Id.</u> at 324.

This holding and this reasoning applies to § 87, regarding city officials' discretion with respect to *whether* to grant or deny a permit. But Plaintiffs claim that Defendants have unduly broad discretion only with respect to *when* permitting officials issue a decision on a permit application. While it is true that the Supreme Court in <u>Thomas</u> upheld a permit ordinance with a 28-day processing period, and credited this 28-day processing period with cabining official discretion, the Supreme Court held that this 28-day processing period cabined official discretion specifically with respect to the substantive decision of whether to grant or deny the application. Except in this limited respect, it does not appear that the Supreme Court directly addressed the constitutionality of the 28-day processing period. <u>Cf.</u> <u>Sullivan</u>, 511 F.3d at 16 (noting, in rejecting the defendant's reliance on <u>Thomas</u> in defending a 30-day advance notice requirement, that "the question of whether that [28-day] time period was too lengthy does not appear to have been directly at issue in <u>Thomas</u>").

While the Supreme Court in <u>Thomas</u> did not precisely spell out the relevance of the 28-day period to the question of whether official discretion in granting or denying a permit was

sufficiently cabined, the Supreme Court's reasoning appears to have been as follows. The

Supreme Court in Thomas was concerned with cabining official discretion based on the principle

that "a time, place, and manner regulation [must] contain adequate standards to guide the

official's decision *and render it subject to effective judicial review.*" Thomas, 534 U.S. at 323

(emphasis added). In the absence of *any* specified processing period, a permitting authority could

preclude meaningful judicial review of a permit denial by indefinitely delaying a decision, thus

effectively denying a permit without explanation. The existence of *a* statutory permit processing

period in the Chicago park ordinance cabined official discretion with respect to the substantive

decision on a permit application, and that processing period just happened to be twenty-eight

days. Based on this reading, the Supreme Court in Thomas did not express any view on how

short a permit processing period must be to comport with the First Amendment.

Accordingly, § 87-4(A) is likely invalid, because it grants unbridled discretion to

permitting authorities with respect to when they issue a decision on a permit application within a

maximum 28-day period.

### ii.  Section 87-3(A)(13)

Section 87-3(A)(13) prohibits the use of "signs" at demonstrations. Plaintiffs argue that

this provision lacks content-neutrality, because it imposes unique restrictions on signs with

political messages, as opposed to other types of messages. Pls.' Mem. of Law at 12–14. The

Court disagrees with this interpretation of the provision but reaches the same legal conclusion

that it violates the First Amendment, for different reasons.

The Court must first determine whether the ordinance is aimed at suppressing the content

of speech, and, if so, whether a compelling state interest justifies the suppression. See

Consolidated Edison Co. v. Pub. Serv. Comm'n, 447 U.S. 530, 540 (1980). But even if the

restriction is content-neutral, it is not necessarily constitutional. A content-neutral restriction still

must "serve a substantial governmental interest" and "allow[] for reasonable alternative avenues

of communication." Derusso v. City of Albany, 205 F. Supp. 2d 16, 19 (N.D.N.Y. 2002) (quoting

City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 50 (1986)).

While § 87-3(A)(13) is by no means a model of clarity, it appears, contrary to Plaintiffs'

interpretation, to ban *all* signs at demonstrations. Section 87-3(A)(13) prohibits the use of

"signs" "as defined in City Code, Chapter 180." § 87-3(A)(13). As discussed, Chapter 180 does

not contain a provision defining "sign," but does define "signage," broadly, to include a

capacious category of sign-like devices, and also defines a variety of terms designating specific

types of signs, mostly distinguished by features other than the content of the message displayed,

such as differing shape and placement. See Chapter 180-3. In fact, the provision defining

"signage" appears to imply a broad definition of sign, encompassing a variety of messages,

physical structures, and sign placements:

> [S]igns, as defined in this chapter, includ[e], but [are] not limited to,
> advertisements, announcements, declarations, demonstrations,
> displays, illustrations, information, insignia or logos, notices, or
> directional guidance used to advertise or promote the interests of any
> person, organization or business when placed in view of the general
> public. The characteristics of a sign include any material, structure,
> device, or design that is composed of any form of visual presentation
> in or on which letters and symbols as pictorial matter is placed when
> used or located out of doors or upon the exterior of any building,
> including a window display area.

Chapter 180-3. And to the extent that this provision cannot be read to provide a definition of

sign, "[w]hen a word is not defined by statute, we normally construe it in accord with its ordinary

or natural meaning." <u>Smith v. United States</u>, 508 U.S. 223, 228 (1993). It is sufficient for present purposes to note that the term in everyday usage denotes a variety of physical devices used to display a variety of types of messages.

While apparent drafting errors generate some ambiguity as to what is encompassed by "sign" in § 87-3(A)(13), by no plausible reading does this term apply only to political signs. Plaintiffs read § 87-3(A)(13) as incorporating timing restrictions in Chapter 180 on the display of "temporary signs," including "political aid election notices," and size restrictions that apply specifically to "political signs or election notices." <u>See</u> Chapter 180-4(G)(1), (G)(3); Pls.' Mem. of Law at 13. But § 87-3(A)(13) incorporates the *definition* of sign in Chapter 180, not all of the chapter's restrictions. <u>See</u> § 87-3(A)(13). Indeed, there is no reasonable basis for interpreting "sign" in § 87-3(A)(13) to imply any particular type of message. For not only is "sign" seemingly broadly defined in Chapter 180 so as to erase any such distinction, but so is the statutory term "demonstration," which designates a broad category of gatherings at which signs might be displayed, gatherings that might be political in motivation or not. <u>See</u> § 87-2(A). By this reading, § 87-3(A)(13) is content-neutral. <u>Cf.</u> <u>Foti v. City of Menlo Park</u>, 146 F.3d 629 (9th Cir. 1998) (observing that "[a]t first blush, Menlo Park's ordinance appears to be content-neutral; after all, it bans all signs on all public property," but finding that the ordinance's exceptions entailed content-based distinctions), <u>as amended on denial of reh'g</u> (July 29, 1998).

But § 87-3(A)(13) is still unconstitutional, because such a broad definition of "sign" as is contained in the definition of "signage" in Chapter 180-3, or as is implied by the everyday usage of the term, combined with the broad definitions of "demonstration" and "public" property in § 87-2, entails a comprehensive prohibition on speech. This prohibition, to say the least, does not

43

"leave open ample alternatives for communication." Lusk, 475 F.3d at 493. Any ban on an entire medium of speech, such as, in this case, all signs displayed at public gatherings of substantial size, is likely unconstitutional. See City of Ladue, 512 U.S. at 55 ("Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent—by eliminating a common means of speaking, such measures can suppress too much speech.").

In City of Ladue, for instance, the Supreme Court invalidated a local ordinance banning all signs on residential property except "residence identification" signs, "for sale" signs, and signs warning of safety hazards. See 512 U.S. at 45, 59. The Supreme Court found that the ordinance did not "leave open ample alternative channels for communication," as "adequate substitutes [did not] exist for the important medium of speech that [the city] ha[d] closed off." Id. at 56. The city argued that its ordinance was a permissible regulation of the "time, place, or manner" of speech, because residents were free to communicate by other means, such as hand-held signs. See id. The Supreme Court rejected this argument, reasoning that signs posted on one's property serve unique purposes and have unique benefits; for instance, "precisely because of their location, such signs provide information about the identity of the speaker." Id. (internal quotation marks omitted).

The same principle applies in this case. A sign at a demonstration serves unique purposes and has unique benefits, compared to, for instance, a sign on a lawn. One carries a sign at a demonstration to project the message of a crowd in a manner visible to onlookers. There is no substitute for such a medium of speech in such a setting. See Edwards v. City of Coeur D'Alene, 262 F.3d 856, 866–67 (9th Cir. 2001) (holding that a blanket prohibition on signs attached to

44

supports and carried during parades and public assemblies on city streets failed to leave open sufficient alternative channels of communication, because alternative modes of communication would not permit the plaintiff to effectively "reach the minds of willing listeners and . . . win their attention").

Defendants argue that § 87-3(A)(13) "does ***not*** ban signs that individuals may carry or use during public demonstrations and, in fact, does not relate at all to signs which are carried or displayed during protests/demonstrations." Response at 14 (emphasis in original) (citing Lydon Decl. at ¶ 13). Defendants, in essence, accept Plaintiffs' invitation to read § 87-3(A)(13) as incorporating the restrictions in Chapter 180-4(G)(1), without explaining why this is the case, but differ in their interpretation of the latter provision. Id. For the reasons stated, the construal of § 87-3(A)(13) as incorporating Chapter 180-4(G)(1) has no textual basis, and Defendants offer no authoritative source beyond the text to support their reading of § 87-3(A)(13). The Court therefore rejects Defendants' interpretation of § 87-3(A)(13) as incorporating Chapter 180-4(G)(1), rejects any argument premised on this interpretation, and disregards as irrelevant any argument pertaining to the proper interpretation of Chapter 180-4(G)(1).

Accordingly, Plaintiffs have shown a likelihood of success with respect to their First Amendment challenge to § 87-3(A)(13).

*iii. Section 87-7*

Plaintiffs aver that § 87-7 imposes strict liability for violating the law's provisions, and that due to the First Amendment concerns implicated by several of the law's provisions, this strict liability standard violates the First Amendment. The Court agrees that § 87-7 lacks a scienter requirement, as it imposes liability on "[a]ny person or other legal entity who violates

any of the provisions of this local law," without any qualification. § 87-7.

Strict liability is disfavored for criminal penalties when First Amendment concerns are implicated, and a knowledge requirement is necessary for any sanctions provision that might chill speech. See American–Arab Anti–Discrimination Comm., 418 F.3d at 610–13 (holding that a sanctions provision imposing fines on participants in unpermitted marches on the basis of strict liability violates the First Amendment) (citing Smith v. California, 361 U.S. 147, 152–53 (1960) (stating that when a strict liability provision applies to First Amendment-related conduct, such a provision may "have the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it")); Video Software Dealers Ass'n v. Webster, 968 F.2d 684, 690 (6th Cir. 2005) ("[A]ny statute that chills the exercise of First Amendment rights must contain a knowledge element."). The Court notes that many municipalities "effectively regulate parades and processions without resorting to a strict liability regime." American–Arab Anti–Discrimination Comm., 418 F.3d at 612 (collecting statutory authorities).

As a problematic example of how this strict liability sanction provision might operate, the Court considers a situation in which an organizer arranges a protest that she reasonably anticipates will be attended by fewer than twenty-five people but that is actually attended by twenty-five or more. In such a situation, it appears that, under §§ 87-7 and 87-2(B), such an organizer could be subject to criminal penalties despite her lack of intent to hold a "demonstration" to which permit requirements apply.

The problematic consequence of strict liability in the context of regulations burdening speech is that the potential violator (in this case, a demonstration organizer) will err on the side of self-censorship in order to steer well clear of the possibility that she will be sanctioned for a

46

violation that she accidentally commits. See Smith, 361 U.S. at 153 ("For if the bookseller is

criminally liable [for obscenity] without knowledge of the contents, and the [anti-obscenity]

ordinance fulfills its purpose, he will tend to restrict the books he sells to those he has inspected;

and thus the State will have imposed a restriction upon the distribution of constitutionally

protected as well as obscene literature."). Mindful of applicable sanctions, an organizer may, for

instance, rather than simply seeking a permit for public gatherings she anticipates will be

attended by at least twenty-five people, seek a permit for any public gatherings she organizes, to

insure against the possibility that a gathering will unexpectedly turn out to be attended by at least

twenty-five people.[8] She may do this despite the fact that she unambiguously has both a

constitutional right to organize small gatherings without acquiring a permit, see Santa Monica

Food Not Bombs, 450 F.3d at 1039 (noting that "the significant governmental interest justifying

the unusual step of requiring citizens to inform the government in advance of expressive activity

has always been understood to arise only when large groups of people travel together on streets

and sidewalks," and collecting cases), and a statutory right to do so under § 87.

　　　　Accordingly, this provision is unconstitutional insofar as it is applied to violations of

§§ 87-2(B) and 87-3(A)(13), which impose speech-restrictive requirements on demonstration

organizers. But Plaintiffs have not provided any basis for concluding that § 87-7 is

unconstitutional insofar as it provides sanctions for violations of § 87-3, apart from the anti-

---

　　　　[8] Plaintiffs point to instances in the past in which they have, in this manner,
unintentionally organized protests of at least twenty-five people. See Compl. ¶¶ 34–35, 49, 56 (in
describing certain past APEX-organized protests, stating that "plaintiffs would have no idea how
many people would participate in a counter protest"; "[m]any people would just come [to] the
rally without having previously indicat[ed] they would attend"; and "[Plaintiffs have] no idea
whether a few people or a few dozen people will assemble and participate").

"sign" provision.

Defendants argue that § 87-7 is constitutional as applied to violations of any provision of § 87, including §§ 87-2(B) and 87-3(A)(13). As their sole support for this argument, Defendants point out that the ordinance upheld in Thomas contained an identical provision. Response at 9. But because that analogous provision in the Chicago park ordinance was not at issue in Thomas and was not discussed anywhere in the Supreme Court's opinion, Defendants' argument is unpersuasive.

**C. Severance**

Having found that Plaintiffs have established a likelihood of success on the merits in their challenges to §§ 87-4(A) and 87-3(A)(13), the Court turns to the question of whether these provisions are severable. "The normal rule is that partial, rather than facial, invalidation is the required course, and we therefore should refrain from invalidating an entire statute when only portions of it are objectionable." Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 124 (2d Cir. 2017) (internal quotation marks, citations, and alterations omitted). Severance is a question of state law, and under New York law, "[t]he question is in every case whether the Legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether. The answer must be reached . . . by considering how the statutory rule will function if the knife is laid to the branch, instead of at the roots." Id. (quoting People ex rel. Alpha Portland Cement Co. v. Knapp, 230 N.Y. 48, 60 (1920)).

In particular, § 87-3, which prohibits certain activities and items for safety reasons, should remain, with the exception of the anti-"sign" provision at § 87-3(A)(13). These

enumerated prohibitions, insofar as they apply to non-permitted gatherings, impose requirements that can as a practical matter be enforced independently from the constitutionally suspect provision at § 87-4(A). See Centro De La Comunidad Hispana De Locust Valley, 868 F.3d at 124. These provisions also appear to serve essentially legitimate public safety objectives. See id. Moreover, although Plaintiffs purport to challenge the statute as a whole, they have not elaborated any bases for challenging § 87-3, apart from § 87-3(A)(13).

Section 87-7, providing sanctions, also should remain. Plaintiffs' have shown a likelihood of success on the merits with respect to their First Amendment challenge to § 87-7's strict liability standard for enforcing § 87-3(A)(13), which is enjoined due to its likely unconstitutionality, and § 87-2(B), which for reasons discussed below related to severance is also enjoined. But Plaintiffs have not alleged, let alone shown a likelihood of success with respect to a claim that the enforcement of § 87-3, apart from the anti-"sign" provision, via a strict liability standard, would be unconstitutional.

By contrast, Sections 87-2(B), 87-4(B)–(F), 87-5, and 87-6 must be enjoined, due to their logical and practical inseparability from the permit processing timing provision at § 87-4(A). "[S]everance is inappropriate when the valid and invalid provisions are so intertwined that excision of the invalid provisions would leave a regulatory scheme that the legislature never intended." Nat'l Advert. Co. v. Niagara, 942 F.2d 145, 148 (2d Cir. 1991). And "[t]he legislature could not have intended a provision to be severed if the balance of the legislation is incapable of functioning independently." Id. Once the enforcement of § 87-4(A) is enjoined, there is, impossibly, no time at all during which the review of a permit application may take place. Provisions requiring the filing of a permit, § 87-2(B), governing the standards by which a permit

49

may be granted or denied, § 87-4(B), providing a process by which a denied application may be

perfected, § 87-4(C), providing a process by which a denial may be appealed, § 87-4(E),

specifying notice requirements for the denial of a permit "on the basis of a prior reservation of

the space and time," § 87-4(D), referencing a permit application form, § 87-4(F), specifying that

there shall be no fees for a permit, § 87-5, and imposing clean-up responsibilities on permit

holders, § 87-6, thus become vestigial. Their enforcement is consequently enjoined as well.[9]

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiffs' motion for a preliminary injunction (Dkt. No. 4) is

**GRANTED** with respect to §§ 87-2(B), 87-3(A)(13), 87-4, 87-5, and 87-6; and it is further

**ORDERED**, that Defendants are hereby enjoined and restrained, until further order of the

Court, from enforcing these provisions; and it is further

**ORDERED**, that Plaintiffs' motion is otherwise **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      July **22**, 2020

Albany, New York

LAWRENCE E. KAHN
United States District Judge

---

[9] Sections 87-1 ("Legislative findings; intent and purpose; authority") and 87-2 ("Compliance with other provisions; definitions; construal of provisions"), with the exception of § 87-2(B), also may remain, as these provisions do not impose any requirements.