UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

AMERICAN PATRIOT EXPRESS, *et al.,*,

                Plaintiffs,

-against-                                      1:20-CV-0672 (LEK/CFH)

CITY OF GLENS FALLS, *et al.*,

                Defendants.

## <u>MEMORANDUM-DECISION AND ORDER</u>

**I.    INTRODUCTION**

Plaintiffs American Patriot Express ("APEX"), David Vanscoy, Florence Sherman, and E.S. (collectively, "Plaintiffs") have brought this action against defendants the City of Glens Falls (the "City" or "Glens Falls"), and, all in their official capacities, Glens Falls Mayor Daniel Hall, Glens Falls Police Chief Anthony Lydon, and Glens Falls City Clerk Robert Curtis (collectively, "Defendants"). Dkt. No. 1 ("Complaint"). Plaintiffs challenge the constitutionality of Glens Falls City Code § 87 under the First, Second, and Fourteenth Amendments to the United States Constitution. Id. ¶¶ 11–12. Before the Court is Defendants' motion for reconsideration of the Court's July 22, 2020 Memorandum-Decision and Order granting in part Plaintiffs' motion for a preliminary injunction. Dkt. Nos. 4 ("Motion for a Preliminary Injunction"), 33 ("July 22 Memorandum-Decision and Order"), 37 ("Motion for Reconsideration").

For the reasons that follow, the Court denies Defendants' Motion for Reconsideration.

## II.     BACKGROUND

The facts of this case were detailed in the July 22 Memorandum-Decision and Order, familiarity with which is assumed. For convenience, the Court summarizes the facts relevant to the Motion for Reconsideration.

Glens Falls City Code § 87 regulates "demonstrations," defined as "pre-planned gathering[s] of 25 or more persons . . . convene[d] for the purpose of a public exhibition including a procession, parade, protest, picket, march or rally," § 87-2(A), on "public" property, defined as "any place to which the public has unrestricted access," excluding indoor spaces, § 87-2(C). Any "person, corporation, partnership or other entity" that "hold[s] or cause[s] to be held" any "demonstration," as defined above, anywhere on "public" property, as defined, must first acquire a permit. See § 87-2(B). Section 87-4(A) provides that permit applications must be submitted to the City Clerk and "will be processed in order of receipt[,] and in all cases decisions whether to grant or deny the application will be delivered within 14 days of application, unless, upon written notice to the applicant, a further 14-day extension is necessary." § 87-4(A).

Plaintiffs are a political organization with a conservative mission, and a collection of people who frequently engage in protests and counter-protests in Glens Falls in support of police, President Donald Trump, and United States Congresswoman Elise Stefanik, and against left-wing demonstrators. Compl. ¶¶ 16–23, 28–49.

Prior to the law's passage, Vanscoy and Sherman both participated in political demonstrations organized by APEX and attended by more than twenty-five people in outdoor public spaces in Glens Falls. Id. ¶¶ 17, 20, 32. Prior to the issuance of a preliminary injunction, Vanscoy, Sherman, and E.S. had all abstained from protesting subsequent to the passage of § 87,

2

because they feared that the City "will enforce City Code § 87 in a discriminatory manner." Id. ¶¶ 18, 21, 23. Plaintiffs have, on at least one instance, refrained from protesting because the delay inherent in the maximum 28-day review period precluded their protest. Specifically, on June 3, when Sherman learned that a planned Black Lives Matter ("BLM") protest was to occur on June 5, Plaintiffs wished to organize a simultaneous counter-protest but refrained from doing so, because they believed that § 87 required a permit for this counter-protest and that the 28-day permit processing period precluded their acquisition of a permit on two days' notice. Id. ¶¶ 66–70. At the time that they filed the Complaint and Motion for a Preliminary Injunction, Plaintiffs planned to stage a protest countering the message of the June 5 BLM protest, as soon as possible. Id. ¶¶ 78–83.

On June 16, 2020, Plaintiffs filed this action, mounting a facial challenge to the statute and seeking to preliminarily enjoin the enforcement of the statute. See generally Complaint; Mot. for a Preliminary Injunction. On July 22, the Court granted Plaintiffs' motion in part. See July 22 Memorandum-Decision and Order at 50. As relevant to Defendants' Motion for Reconsideration, the Court preliminarily enjoined the enforcement of all of the statute's requirements related to permitting. See id. at 48–50.

Defendants now move for reconsideration of the July 22 Memorandum-Decision and Order, on the following grounds: (1) the Court committed clear error in holding that Plaintiffs had standing to challenge the ordinance's permitting requirements; (2) the Court failed to give due consideration to the hardships that would be sustained by Defendants due to the preliminary injunction; and (3) the Supreme Court's decision in Thomas v. Chicago Park District, 534 U.S. 316 (2002), compelled the Court to deny the preliminary injunction.

**III.    LEGAL STANDARD**

Rule 59(e) of the Federal Rules of Civil Procedure applies to re-argument motions pertaining to preliminary injunction orders. See, e.g., Southern Air Crew Group v. Southern Air, Inc., No. 08-CV-1115, 2009 WL 1795045, at *2 (D. Conn. June 24, 2009) (noting that "'judgment' for purposes of the Federal Rules of Civil Procedure[,] includes any order from which appeal lies, including [an] interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(l) of [an] order granting, refusing, or refusing to dissolve an injunction, and thus rule 59(e) applies to such order.") (citing Lichtenberg v. Besicorp Group Ins., 204 F.3d 397, 400 (2d Cir. 2000)).

"The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (internal citation and quotation marks omitted). "Reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." Parrish v. Sollecito, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (internal quotation marks omitted). Such motions "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). "[A] motion to reconsider should not be granted where the moving party seeks solely to re[-]litigate an issue already decided." Id. "[A] motion for reconsideration is neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced." Associated Press v. U.S. Dep't of Def., 395 F. Supp. 2d 17, 19

(S.D.N.Y. 2005). "[T]he movant must present evidence that is 'truly newly discovered or . . . could not have been found by due diligence.'" Ins. Co. of N. Am. v. Public Serv. Mut. Ins. Co., 609 F.3d 122, 131 (2d. Cir. 2010) (citing United States v. Potamkin Cadillac Corp., 697 F.2d 491, 493 (2d Cir. 1983)).

## IV.  DISCUSSION

The Court addresses in turn each of Defendants' three proposed bases for reconsideration. The Court concludes that Plaintiffs have standing, that the public interest and relative burdens favor a preliminary injunction, and that Thomas is distinguishable, and therefore denies Defendants' Motion for Reconsideration.

### A. Standing

#### 1. Relevant Standing Principles

As detailed in the July 22 Memorandum-Decision and Order, there are general constitutional standing principles relevant to this case, as well as principles regarding what constitutes injury-in-fact in a First Amendment context. See July 22 Mem.-Decision and Order at 10–11.

Constitutional standing requires: (1) that an injury be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that there be "a causal connection between the injury and the conduct complained of"; and (3) that it be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

First Amendment Supreme Court jurisprudence has developed more particular rules as a subset of the injury-in-fact requirement.

Historically, facial challenges were disfavored, in part because courts regarded them as an attempt by the plaintiff to raise the rights of others. See Osediacz v. City of Cranston, 414 F.3d 136, 140–41 (1st Cir. 2005) (citing United States v. Raines, 362 U.S. 17, 20–22 (1960)). Under this outdated approach, "the normal jus tertii rules made it nearly impossible to have a court declare a statute facially unconstitutional; after all, an individual litigant would have standing to object to it only as applied to her situation. As a corollary, a plaintiff who had not herself been subjected to an unconstitutional exercise of power could not challenge the offending statute at all." Id. (internal citations omitted).

In City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750 (1988), the Supreme Court recognized that this posed a conundrum in the context of First Amendment challenges to permitting schemes. The Supreme Court recognized that "as long as no one was denied a permit, no one would have standing to mount a challenge—yet the chilling effect of the unconstitutional grant of standardless discretion would remain undiminished." Osediacz, 414 F.3d at 141 (citing City of Lakewood, 486 U.S. at 757–58). Accordingly, the Supreme Court loosened the traditional prudential limits that constrain a plaintiff's standing with respect to facial challenges brought to statutes that allegedly vest unbridled discretion in licensing authorities. See City of Lakewood, 486 U.S. at 759. The Supreme Court held that in the case of "a licensing statute [that] allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity," a plaintiff "who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." Id. at 755–56.

Needless to say, it does not follow that just anyone has standing to mount a First Amendment challenge to a permitting scheme. Rather, as the Supreme Court stressed in City of

6

Lakewood, a plaintiff, as a prerequisite to suit, has to show that the law that she aspires to challenge has "a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." Id. at 769. Subsequent to that case, courts have tended to require that "the party mounting a facial challenge at the very least desired or intended to undertake activity within the compass of the challenged statute." Osediacz, 414 F.3d at 141 (collecting cases).

As also mentioned in the Court's July 22 Memorandum-Decision and Order, two lines of First Amendment case law refine this requirement—one pertaining to the "chilling effect" realized through self-censorship, and one pertaining to pre-enforcement fear of sanctions. See July 22 Mem.-Decision and Order at 10–11. The chilling effect of a law that censors speech and the pre-enforcement fear inflicted by such a law implicate a similar sort of injury: "[b]oth hinge on the existence of a credible threat that the challenged law will be enforced. If such a threat exists, then it poses a classic dilemma for an affected party: either to engage in the expressive activity, thus courting prosecution, or to succumb to the threat, thus forgoing free expression." N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 10 (1st Cir. 1996). "Either injury is justiciable." Id.

In chilling effects jurisprudence, courts require an "objective" chill. See Laird v. Tatum, 408 U.S. 1, 12–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"). "[T]o establish standing in this manner, a plaintiff must proffer some objective evidence to substantiate his claim that the challenged [regulation] has deterred him from engaging in protected activity." Latino Officers Ass'n v. Safir, 170 F.3d 167, 170 (2d Cir. 1999) (quoting Bordell v. General Elec. Co.,

7

922 F.2d 1057, 1060–61 (2d Cir. 1991)) (alteration in original). Analogously, in pre-enforcement First Amendment standing jurisprudence, courts require that a plaintiff demonstrate an "actual and well-founded fear that the law will be enforced against them." Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 393 (1988).

There is some overlap in the applicability of these two sets of standards. See, e.g., id. at 393 (noting in the context of pre-enforcement standing analysis that "the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution"); New Hampshire Right to Life Political Action Comm., 99 F.3d at 14 ("Because the threat of prosecution is a common denominator of both types of injury, their existence can be resolved in a single inquiry."). Indeed, the two forms of analysis seem to overlap in the present case, as Plaintiffs allege that they have engaged in self-censorship, Compl. ¶¶ 66–70, and they maintain that they are career protestors who thus anticipate running into § 87's restrictions and being subject to enforcement, id. ¶¶ 17, 20, 32, 78–83.

Cases in this Circuit and others provide some guideposts regarding standing for First Amendment challenges to content-neutral permitting schemes. It is clear, on the one hand, that one cannot establish standing if the activity in which one intends to engage is not actually regulated by the challenged statute. In Coe v. Bloomington Grove, for instance, in which the plaintiff challenged a content-neutral permitting scheme for public demonstrations, the court found that she had not established standing to challenge a provision that applied only to for-profit organizations, because she was an individual, and she had "not expressed any intention of organizing an event featuring for-profit or commercial speech." 567 F. Supp. 2d 543, 553–55 (S.D.N.Y. 2008), aff'd in part, vacated in part on other grounds, 429 F. App'x 55 (2d Cir. 2011).

On the other hand, in Stagg P.C. v. United States Dep't of State, 158 F. Supp. 3d 203 (S.D.N.Y. 2016), the plaintiff established standing merely by alleging that it planned to engage in an activity that was regulated by the statute. The plaintiff challenged a content-neutral licensing scheme[1] governing the export of "defense articles" and "defense services." Id. at 205. Plaintiff alleged that it possessed certain technical data that it planned to present at a conference, that releasing this data to the public required prior approval by the relevant licensing authority, and that the standards governing licensure granted unbridled discretion to that authority. Id. at 209.

In Sullivan v. City of Augusta, the plaintiffs challenged a content-neutral permitting scheme for public gatherings. 511 F.3d 16, 20–23 (1st Cir. 2007). The court found that plaintiffs established standing to challenge a 30-day advance notice provision, when one of the plaintiffs had stated in a deposition that he was deterred from applying for a permit on one occasion in late March, because it was too late to request a permit for an April 10 demonstration. Id. at 31. The city had argued that plaintiffs lacked standing to challenge the provision, because they never demonstrated any intent or need to apply for their parade permits fewer than thirty days before the marches for which the permits were being sought. Id. The court rejected this argument, noting that "a late application is not necessary if injury can otherwise be surmised." Id.

### 2. The Court's July 22 Holding

Based on these illustrative cases, Plaintiffs have more than adequately demonstrated standing. First, they submitted a sworn statement that they intend to engage in a public gathering that Defendants do not dispute qualifies as a statutory "demonstration" to which permitting

---

[1] See Stagg P.C. v. United States Dep't of State, 354 F. Supp. 3d 448, 469 (S.D.N.Y. 2019) (later proceeding in which court explicitly stated that the challenged regulation was content-neutral).

requirements apply. As the Court recounted in its July 22 Memorandum-Decision and Order:

> At the time that they filed the Complaint and Motion, Plaintiffs planned to stage a protest countering the message of the June 5 BLM protest, as soon as possible. Compl. ¶¶ 78–83. At that demonstration, protesters were to advocate in favor of police and display political signs in support of Trump and Stefanik. Id. ¶¶ 79–80. Plaintiffs anticipated that the demonstration would be attended by more than twenty-five people. Id. ¶ 81. The rally was "time sensitive," because "plaintiffs want[ed] to send an important message to police at a time when they and their reputation is under attack." Id. ¶ 82.

July 22 Mem.-Decision and Order at 5–6. As in Stagg P.C., solely on the basis of these statements in their Verified Complaint, Plaintiffs demonstrated standing, as they stated that they intended to engage in allegedly protected speech that was regulated by the statute, and provided a basis for believing that the statutory 28-day period would impede their ability to engage in that conduct. Plaintiffs, in other words, demonstrated an "actual and well-founded fear that the law will be enforced against them," Am. Booksellers, 484 U.S. at 393, and that such enforcement posed a "real and substantial threat of the identified censorship risks." City of Lakewood, 486 U.S. at 769.

Plaintiffs provided additional facts that tend to support an objective basis for their fear that they will be subject to the permitting requirements of § 87. Namely, they explained that they are career protestors who "previously assembled in the City of Glens Falls with [APEX] in groups larger than twenty-five people to engage in political speech on the sidewalks and other public spaces of Glens Falls." See, e.g., Compl. ¶¶ 17, 20. This fact is not necessary to the conclusion that their fear of being subject to enforcement is objectively founded, but it tends to reinforce that conclusion, by rendering their professed desire to engage in that conduct in the future even more credible.

Like the Sullivan plaintiffs, Plaintiffs also provided a specific example of an instance in which their speech was chilled as a consequence of the operation of the 28-day permit-processing provision. As described in the July 22 Memorandum-Decision and Order,

> [O]n June 3, when Sherman learned that a planned Black Lives Matter ("BLM") protest was to occur on June 5, Plaintiffs wished to organize a simultaneous counter-protest [] but refrained from doing so, because they believed that § 87 required a permit for this counter-protest and that § 87's 28-day permit processing period precluded their acquisition of a permit on two days' notice. [Compl.] ¶¶ 66–70. With the intention of protesting, Sherman created signs for use at the protest. Id. ¶ 70.

July 22 Mem.-Decision and Order at 5. In light of the fact that the statute permits a maximum of twenty-eight days to process a permit application, it seems credible and unsurprising that Plaintiffs were deterred from protesting on two days' notice, and this fact reinforces the conclusion that Plaintiffs faced an "objective" chill. See Laird, 408 U.S. at 12–14; Latino Officers Ass'n, 170 F.3d at 170.

### 3. Defendants' Arguments for Reconsideration

Defendants attack Plaintiffs' standing with several arguments, none of which are proper bases for reconsideration, and all of which are meritless.

Defendants argue, first, that the Court improperly analyzed standing under principles applicable to content-based prior restraints rather than content-neutral permitting schemes. See Mot. for Reconsideration at 20 ("As a threshold matter, because City Code § 87 must be examined under the standard applied to content-neutral time, place, and manner regulations, the traditional Article III standing requirements should have been analyzed in this case, rather than the 'relaxed' standards involving prior restraints."). Defendants do not specify what aspect of the

Court's reasoning they believe was derived from standing rules that apply uniquely to challenges to content-based regulations. And as should be clear from the above analysis, the standards the Court applied indeed govern challenges to content-neutral permitting schemes. Defendants thus have failed to establish that the Court committed any clear error in this respect.

Second, Defendants argue that Plaintiffs' fear that they will be subject to enforcement under § 87 is too speculative to establish standing, because "Plaintiffs have completely failed to provide any record evidence establishing that Defendants denied any of Plaintiffs' permit applications or that Defendants intervened in any of Plaintiffs' spontaneous demonstrations due to the absence of a permit." Id. at 17. The reason the Court did not find that these facts undermine standing is that in the case of "a licensing statute [that] allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity," a plaintiff "who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." City of Lakewood, 486 U.S. at 755–56; see also Sullivan, 511 F.3d at 31 ("While it is true [plaintiffs] never applied later than the thirty days before the sought-for permit, a late application is not necessary if injury can otherwise be surmised."). Plaintiffs also need not endure sanctions for protected speech in order to challenge a statute that allegedly violates the First Amendment. See Am. Booksellers Ass'n, Inc., 484 U.S. at 393 (holding that a plaintiff can establish pre-enforcement standing if she demonstrated an "actual and well-founded fear that the law will be enforced against" her); see also Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 689 (2d Cir. 2013) (noting that pre-enforcement First Amendment claims are analyzed "under somewhat relaxed" standing rules, because "without the possibility of pre-enforcement challenges, plaintiffs face an unattractive set of options . . . refraining from activity

they believe the First Amendment protects, or risk[ing] civil or criminal penalties for violating the challenged law"). There was thus no clear error here.

Third, Defendants argue that Plaintiffs lack standing because protests in which they have participated in the past are not statutory "demonstrations." See Mot. for Reconsideration at 17–18; § 87-2(A). This is based on an interpretation of the statute according to which, in order for a public gathering to qualify as a "demonstration," (1) the gathering must not be "spontaneous," and (2) the protest organizer must intend ahead of time that twenty-five people will attend. As far as the "non-spontaneous" requirement is concerned, the Court has already considered and rejected this argument, and it is thus inappropriate for Defendants to raise it in their Motion for Reconsideration. See Shrader, 70 F.3d at 257 ("[A] motion to reconsider should not be granted where the moving party seeks solely to re[-]litigate an issue already decided.").

The Court now turns to the second aspect of Defendants' interpretive argument. Defendants do not appear to deny that the protest that was upcoming at the time of filing was, in a "pre-planned" manner, to be attended by twenty-five people, and indeed, such a reading of Plaintiffs' Complaint would be implausible. See Compl. ¶ 81 (stating in reference to the planned protest that "[p]laintiffs believe that more than twenty-five (25) people will be present at the rally.").[2] Rather, Defendants appear to interpret the language of Plaintiffs' Complaint to suggest that their protests *prior* to filing were only accidentally, and without their prior expectation, attended by twenty-five people. See, e.g., Compl. ¶ 17 ("Dave Vanscoy . . . has previously

---

[2] It seems logical to infer that Plaintiffs also anticipated that at least twenty-five people would attend this protest when they initially conceived of the rally on June 3, 2020, at which point Plaintiffs' plans were allegedly thwarted by the statutory 28-day permitting processing period. See Compl. ¶¶ 66–70.

13

assembled in the City of Glens Falls with the American Patriots in groups larger than twenty-five people to engage in political speech on the sidewalks and other public spaces of Glens Falls."); id. ¶¶ 32–35 ("When the American Patriots planned a political rally in the City of Glens Falls . . . Many people would just come at the rally without having previously indicating they would attend. Consequently, when the American Patriots have a political rally in Glens Falls, Ms. Sherman has no idea whether a few people or a few dozen people will assemble and participate.").[3] This, according to Defendants' interpretation of § 87, places every past protest beyond the reach of the statute.[4]

---

[3] Plaintiffs disagree with Defendants' reading of their Complaint and maintain with respect to protests of over twenty-five that Plaintiffs' organized in the past, see, e.g., Compl. ¶ 17, 20, that they anticipated on those occasions that at least twenty-five people would attend, see Dkt. Nos. 30 at 2–3; 30-2 at 8.

[4] In their response to Plaintiffs' Motion for a Preliminary Injunction, Defendants stated that, by their interpretation of the ordinance, permitting requirements applied only to "official groups of twenty-five or more individuals who have *committed* (i.e., pre-planned) to attend a *scheduled* (i.e., pre-planned) demonstration . . . Plaintiffs . . . are . . . an unincorporated association, with no formal structure, and composed of two individuals." Dkt. No. 24-11 at 12 (emphasis in original). The Court read this to mean that Defendants interpreted the permitting requirements to apply only to applicants applying as a pre-organized group of twenty-five people. July 22 Mem.-Decision and Order at 11–12. Defendants appear to restate this interpretation, see Defs. Mem. of Law at 14, 17–18, 19, without providing any cognizable basis for the Court to reconsider its initial decision on the matter. The Court declines to do so.
  The Court notes, however, in an abundance of solicitude, that Defendants' Motion for Reconsideration could be construed to additionally make the distinct interpretive argument that an applicant must "pre-plan" for twenty-five people to attend a protest, for that protest to qualify as a statutory "demonstration." The statute is ambiguous on this point, as "pre-planned gathering of 25 or more persons," § 87-2(A), could be read to mean that only the gathering must be "pre-planned," or that both the gathering and the specific number of attendees must be "pre-planned." Moreover, to the extent that the term "pre-planned" implies some particular type of mens rea, the statute does not specify which, and neither have Defendants. In light of the fact that permit applicants are subjected to these unresolvably ambiguous requirements, for an applicant who is unsure whether less or more than twenty-five people will attend her protest, there would be an "objectively reasonable possibility that the ordinance would be applied to [her] own activities," Sullivan, 511 F.3d at 26, which is sufficient to confer standing.

The Court need not re-litigate this interpretive disagreement here, because even if Defendants were correct both in their reading of the Complaint and in their interpretation of the statute, Plaintiffs would have standing. As already discussed, Plaintiffs' sworn statement that they planned to engage in a public protest of more than twenty-five people at the time of filling was sufficient to establish standing, and was, in combination with Plaintiffs' description of a prior instance in which the statute's requirements thwarted their planned protest, more than adequate to demonstrate standing.

Moreover, Plaintiffs' prior record as career protestors would still tend to provide further support for standing. Even if protests Plaintiffs organized in the past were not statutory "demonstrations" due to the *unexpected* attendance of twenty-five or more people, Plaintiffs' knowledge from experience that a protest is likely to be unexpectedly attended by twenty-five people would supply the requisite level of "pre-planning" that Defendants suggest the statute requires, for purposes of a permit application in the present or future.

Defendants' interpretive argument against standing is, in other words, "irrelevant to the ultimate outcome" of standing analysis for multiple reasons and thus not a proper basis for reconsideration. Latimore v. NBC Universal, Inc., 489 Fed. App'x. 521, 521 (2d Cir. 2013).

### B. Preliminary Injunction

Defendants argue, next, that the Court failed to assess the relative burden that a preliminary injunction would impose on the Glens Falls government. See Mot. for Reconsideration at 18; Fair Hous. in Huntington Comm. v. Town of Huntington, 316 F.3d 357, 365 (2d Cir. 2003) (noting that "a plaintiff must demonstrate . . . a balance of hardships tipping decidedly in the plaintiff's favor in order for a preliminary injunction to issue."); see also Yang v.

Kosinski, 960 F.3d 119, 127 (2d. Cir. 2020) (noting that a court must find a "public interest weighing in favor of granting the injunction").[5] Defendants are correct in arguing that the Court mistakenly omitted this analysis. Unfortunately for Defendants, this part of the preliminary injunction analysis is largely a formality in First Amendment cases once a plaintiff has established a likelihood of success on the merits. See N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013) ("[I]n the First Amendment context, . . . the likelihood of success on the merits is the dominant, if not the dispositive, factor."). This is because a plaintiff who has established that a statute likely violates her First Amendment rights almost always faces a more weighty burden than a defendant government seeking to enforce an unconstitutional statute.

"[I]t is always in the public interest to protect First Amendment liberties." Connection Distrib. Co., 154 F.3d at 288 (quoting G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir.1994)); Walsh, 733 F.3d at 488 ("[S]ecuring First Amendment rights is in the public interest."); Homans v. Albuquerque, 264 F.3d 1240, 1244 (10th Cir. 2001) ("Having determined that Mr. Homans has demonstrated a substantial likelihood of success on the merits, we believe that the public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression."); Newsom v. Albemarle County Sch. Bd., 354 F.3d 249, 261 (4th Cir.2003) ("Surely, upholding constitutional rights serves the public interest.").

Normally, the Court would assume that the interests of the government are aligned with

---

[5] Where the Government is the opposing party, the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge. Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs., 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018).

the public interest, but that is not so when the government violates an individual's First Amendment rights. See Deferio v. City of Syracuse, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016) (Kahn, J.). Plaintiffs' interests align with those of the people of Glens Falls, because "[t]he constitutional guarantee of free speech serves significant societal interests wholly apart from the speaker's interest in self-expression." Pacific Gas and Elec. Co. v. Public Utilities Comm'n of California, 475 U.S. 1, 8 (1986) (internal quotation marks and citations omitted). "By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information." Id.

For similar reasons, the balance of the equities favors Plaintiffs as well. See, e.g., Invisible Empire Knights of Ku Klux Klan v. City of W. Haven, 600 F. Supp. 1427, 1436 (D. Conn. 1985) ("[T]he balancing of the plaintiffs' interest in free speech against the city's interest in being able to enforce an unconstitutional ordinance clearly establishes that the equities tilt decidedly in favor of the plaintiffs."). Plaintiffs face a significant hardship, namely, surrendering their right to engage in political speech on topical issues. See, e.g., Deferio, 193 F. Supp. 3d at 130–31 (describing the loss of the right to demonstrate as a "substantial" hardship); Walsh, 733 F.3d at 488 (describing impermissible restrictions on political speech as a "significant" hardship to the plaintiff). Glens Falls, on the other hand, "does not have an interest in the enforcement of an unconstitutional law." Walsh, 733 F.3d at 488 (quoting ACLU v. Ashcroft, 322 F.3d 240, 247 (3d Cir. 2003)).

And for reasons analogous to those the Court discussed in the context of its narrow tailoring analysis, see July 22 Mem.-Decision and Order at 30–36, Defendants' burden is particularly light in this case in comparison to Plaintiffs'. While the City has important interests

17

in public safety and reducing traffic congestion, the statute likely censors "substantially more speech than is necessary" to advance those goals. See Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989). Thus, Plaintiffs, and moreover, the public, necessarily face weightier burdens if the permitting provisions remain in effect than Defendants do if the enforcement of those provisions is enjoined. Moreover, the Court's July 22 Memorandum-Decision and Order left intact provisions of the ordinance that directly address the only particularized public safety and traffic-related concerns that Defendants have identified. As the Court explained:

> Defendants . . . highlight public safety concerns related to the possession and use of certain items at protests, such as bullhorns and firearms. Lydon Decl. ¶¶ 8–9. The Court does not discuss those concerns here, because they are addressed by provisions of § 87-3 that Plaintiffs do not directly challenge and that are left in effect subsequent to this order. See, e.g. § 87-3(A)(14) ("Sirens or air horns. No person shall use, carry or possess any hand carried or vehicle-mounted siren or air horn."); § 87-3(A)(17) ("Firearms are prohibited, except for those displayed by participants in the Memorial Day parade and those used by active duty law enforcement personnel."). Defendants also point to special dangers posed by protests in the Glens Falls Centennial Circle traffic circle. Lydon Decl. ¶ 5–6. The Court does not discuss those concerns here either, because there is a specific provision prohibiting protests in that area, see § 87-3(A)(19) ("There shall be no Demonstrations conducted in the public areas known as Centennial Circle and the Civil War Monument within five feet of the roadway."), a provision that Plaintiffs do not directly challenge and that is left in effect subsequent to this order.

July 22 Mem.-Decision and Order at 30 n.5. Because these provisions remain at the City's disposal, Defendants' contention that they sustained significant "hardships . . . due to the broad injunction enforced against them," see Mot. for Reconsideration at 18, rings especially hollow.

Accordingly, the public interest and the balance of the equities favor a preliminary injunction.

18

### C. Applicability of Thomas

Defendants argue that the Supreme Court's decision in Thomas v. Chicago Park District, 534 U.S. 316 (2002) compels the Court to deny Plaintiffs' Motion for a Preliminary Injunction. See Mot. for Reconsideration at 5–16. Defendants emphasized this point heavily in their brief in response to Plaintiffs' Motion for a Preliminary Injunction, see generally Dkt. No. 24-11, and the Court addressed this argument at great length in its July 22 Memorandum-Decision and Order, see generally July 22 Mem.-Decision and Order. This is thus not a proper basis for reconsideration, see Shrader, 70 F.3d at 257, and the Court accordingly declines to revisit the matter at this time.

### V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion for Reconsideration (Dkt. No. 37) is **DENIED**; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:	September 18, 2020
	Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge